In re SUNSPORT, INC., Debtor.

Kevin R. Huennekens, Trustee for the Bankruptcy Estate of SunSport, Inc., Plaintiff,

v.

The Gilcom Corporation of Virginia, Simply Tan USA, Inc., Edward T. Giller, Jill Edney, Patryk Reczek, Defendants.

Bankruptcy No. 97–35052–T.
Adversary No. 98–3061–T.

United States Bankruptcy Court,
E.D. Virginia,
Richmond Division.

March 30, 2000.

Paulo E. Franco, Jr., Wright, Robinson, Osthimer & Tatum, Richmond, Virginia, for trustee.

Lynn L. Tavenner, LeClair Ryan, P.C., Richmond, Virginia, for trustee.

Joel S. Aronson, Ober, Kaler, Grimes & Shriver, Washington, DC, for defendants.

Michael J. Champlin, Bowen, Bryant, Champlin & Carr, Richmond, Virginia, for Patryk Reczek.

Gregg R. Nivala, Office of the United States Trustee, Richmond, Virginia.

## MEMORANDUM OPINION

DOUGLAS O. TICE, Jr., Chief Judge.

Kevin R. Huennekens, trustee in bankruptcy for this consolidated chapter 7 case filed a complaint against the above-named defendants and others that included counts under theories of corporate alter ego, veil piercing, successor liability, and fraudulent transfer. This is a core proceeding. *See* 28 U.S.C. § 157(b)(2) (1994).

### The Trustee's Complaint

The trustee filed a 22 count complaint against several corporate and individual defendants arising out of a prepetition transfer of assets by the debtor SunSport, Inc., to The Gilcom Corporation of Virginia, Inc.

The trustee has dismissed or abandoned several counts, obtained defaults as to some defendants and settled with others.[1] The following issues remain for the court to decide:

Count I: Alter Ego/Single Business Entity. Gilcom and Simply Tan USA, Inc., are alter ego corporations of SunSport rather than distinct entities and should be held responsible for debtor SunSport's obligations.

Count II: Piercing the Corporate Veil. There is such a unity of ownership and

---

1. As discussed *infra* the trustee settled with defendants Peter and Sandra Mills prior to trial and also settled with defendant Chesapeake Engineering Corp.

control between the individual and corporate defendants that it is necessary to disregard the separate corporate identities and hold the individuals personally responsible for SunSport's debts.

Count III: Substantive Consolidation. The individual and corporate defendants have commingled their assets such that a total separation of the entities would be impossible, and the assets of the defendants should be pooled to satisfy the debtor's obligations.

Counts IV and VI: Fraudulent Transfers under Section 548 of the Bankruptcy Code and Virginia Code Section 55–80. The transfer of assets from SunSport to Gilcom and Simply Tan was made with the intent to defraud the debtor's creditors, for less than reasonably equivalent value and resulted in SunSport's insolvency. Furthermore, Gilcom did not take these assets for value and in good faith.

Count X: Violation of Virginia's Bulk Sales Law (Virginia Code Section 8.6A–101). Prior to trial, the court granted summary judgment to the trustee under this count, and the only issue is the amount of damages.

Count XI: Turnover of Property of the Estate. Gilcom and Simply Tan are in possession of property that the trustee may "use, sell, or lease under Section 363 . . ." and are required to deliver that property to the trustee.

Counts XII and XIII: Postpetition Transfers and Conversion of Property of the Estate. Edward T. Giller, acting on behalf of Gilcom, cashed checks that were payments of debts owed to SunSport and that were therefore property of the estate. Giller also converted eleven sunbeds that were property of the estate.

Count XV: Avoidable Preferences under Section 547 of the Bankruptcy Code. SunSport made several transfers within a year of its bankruptcy petition to Gilcom and Simply Tan, on account of antecedent debts, that constituted preferential payments.

Count XXI: Objection to Gilcom's Proof of Claim. Gilcom filed a proof of claim in SunSport's bankruptcy case for sunbeds it shipped but never received payment for. This claim should be disallowed because Gilcom did not submit adequate supporting documentation.

Count XXII: Violation of the Automatic Stay. After SunSport filed for bankruptcy, Gilcom, Simply Tan and Jill Edney violated the automatic stay when they negotiated checks that were in payment of obligations owed to SunSport.

*Successor Liability.*

█ In addition to these counts, the trustee makes the argument, which did not appear in his original complaint, that Gilcom and Simply Tan should be held liable for SunSport's debts under a theory of successor liability. This doctrine is a judicially crafted exception to the general rule that when a corporation purchases all of the assets of another corporation, the purchasing corporation does not become liable for the debts of the selling corporation. Because the defendants did not oppose the trustee's raising of this theory, the court will consider it along with the other counts in the trustee's complaint.

*Default Judgment against Patryk Reczek.*

The court must also consider the damage award against defendant Patryk Reczek, who failed to respond to the trustee's discovery requests and who did not appear at trial. At the close of trial, a default judgment was entered against Patryk Reczek in the amount of $4,283,023.59, representing all indebtedness of the debtor. Subsequently, Reczek moved the court to reconsider and vacate the default judg-

ment. The court denied this motion at a hearing on November 17, 1999, except that the court took under advisement the proper amount of the judgment.

### Summary of Decision

For the reasons stated in this opinion, the court makes the following rulings on the trustee's complaint:

Counts I and III. SunSport, Gilcom and Simply Tan are alter ego corporations and the court will treat them as one entity, rather than as discrete corporations. Accordingly, Gilcom and Simply Tan will be held liable for all of SunSport's debts.

Count II. The trustee has not carried his burden of showing that the activities of Giller and the other individual defendants warrant piercing the corporate veil so that they may be held personally liable for SunSport's obligations. Therefore, judgment will be granted in favor of the individual defendants.

Counts IV and VI. The trustee has proven that the transfer of all of SunSport's assets to Gilcom constituted a fraudulent conveyance under both federal and Virginia law, and Gilcom and Simply Tan will be liable to the estate for the value of those assets, less any amount already paid for them. The value of the assets transferred by SunSport to Gilcom was $327,125.00, and Gilcom has given a total of $240,129.00 in cash and other value as payment. Therefore, Gilcom's and Simply Tan's liability is $86,996.00.

Count X. Gilcom's and Simply Tan's liability for the violation of the Bulk Sales law is $306,516.27, calculated according to formulae in that law. *See* Va.Code Ann. § 8.6A–107 (Michie Supp.1999). However, this amount is included within the liability imposed upon Gilcom and Simply Tan as alter ego corporations of SunSport and under the successor liability theory and will not be double-counted.

Count XI. Judgment will be granted against Gilcom and Simply Tan in the amount of $3,625.00. This represents the value, according to unchallenged evidence given by the trustee's expert, of the various office furnishings and supplies that were removed from SunSport's Richmond offices.

Counts XII, XIII and XXII. Judgment will be granted against Gilcom and Simply Tan in the amount of $34,950.00 for conversion of property of the estate. Giller on behalf of these defendants negotiated checks in this amount payable to SunSport on SunSport's invoices, and his actions on behalf of Gilcom and Simply Tan were a violation of the automatic stay.

Count XV. Judgment will be granted in favor of defendants on the preference claim.

Count XXI. Gilcom's proof of claim will be disallowed not because of inadequate supporting documentation but because of this court's finding that Gilcom is the recipient of a fraudulent conveyance, and because the court holds Gilcom liable for all of SunSport's debt.

*Successor Liability.*

Although not included in the original complaint, the trustee argued in his proposed findings of fact and conclusions of law that Gilcom and Simply Tan are mere continuations of SunSport. This theory of liability is closely related to Counts I and III. The court finds that sufficient evidence was presented to support this theory that successor liability should attach to the corporate defendants. Accordingly, the court finds that Gilcom and Simply Tan should be liable as a successor for all of SunSport's debts, which totaled $4,283,023.59 at the time of the bankruptcy filing.

*Amount of Default Judgment against Patryk Reczek.*

The default judgment against Patryk Reczek will be reduced to the amount of attorneys' fees and costs that the estate incurred in opposing Reczek's motion to vacate his default judgment.

### Findings of Fact

This adversary proceeding involves four related companies. They are the consolidated debtors, Ultrabronz USA, Inc., and SunSport, Inc., The Gilcom Corporation of Virginia, Inc., and Simply Tan USA, Inc. All four companies shared a number of key officers, directors, and shareholders, and all were in the business of manufacturing or distributing a type of high-pressure tanning bed. Both SunSport and UltraBronz were established by three people: Peter and Sandra Mills and Patrick Reczek. UltraBronz was formed by Peter Mills in 1994, and in 1995 it was the exclusive United States distributor of high-pressure tanning beds manufactured by Barclay Leisure, an English company. The beds were marketed under the Ultrabronz name. Operating out of offices in Richmond, Virginia, and Westlake, California, Ultrabronz was initially a very successful company; it had $11,000,000.00 in sales during 1995. By the end of 1996, however, the company's fortunes changed due to the fact that Peter Mills had endeavored to develop his own version of high pressure tanning bed.

On July 29, 1996, Peter and Sandra Mills incorporated SunSport and became its sole shareholders. As part of the consideration for their interest in SunSport, the Mills transferred to the corporation their rights of ownership interest in a sunbed development agreement among Mills, Reczek, and Prorise Investments, Ltd. The Mills had completed a prototype of the SunSport bed, which was similar to the Ultrabronz bed in both appearance and in technology. They intended to distribute this bed through SunSport, and the first of these beds was shipped sometime in November or December 1996.

By January 1997, Ultrabronz had transferred all of its assets to SunSport. SunSport continued in the same Richmond office at Ridgefield Parkway as was previously used by Ultrabronz. The principal officers and directors of SunSport were the same as those of Ultrabronz: Peter Mills served as president of both companies, and Reczek served as vice-president. Both companies had the same non-managerial employees as well. SunSport used the same marketing strategies as Ultrabronz had used and employed the same distributors.

In March 1997, SunSport was still experiencing financial difficulties and was embroiled in a trade dress lawsuit with Barclay Leisure, owner of the intellectual property rights of the Ultrabronz sunbed. This suit arose out of Peter Mills' development of the SunSport sunbed that competed with the Ultrabronz model originally distributed for Barclay Leisure. Mills' action was a violation of Ultrabronz's distributorship agreement, and as a result Barclay Leisure canceled the agreement and obtained an injunction prohibiting Ultrabronz from selling any more tanning beds.

Because of these and other difficulties, Mills and Reczek sought an outside investor. They entered negotiations with Edward T. Giller, a distributor for Ultrabronz and SunSport. Mills and Reczek initially asked Giller for an investment of $600,000.00, which they believed would have allowed SunSport to manufacture 40 beds and maintain its debt obligations. Giller, aware of SunSport's difficult financial situation, agreed to invest only $300,000.00, which he proposed to do by capitalizing an empty shell corporation al-

ready in existence known as Gilcom. Gilcom, which Giller had incorporated in 1983 and used to operate a local radio station, was to receive the $300,000.00 and purchase all of SunSport's assets.[2] These assets were transferred to Gilcom on March 7 and 8, 1997, by a bill of sale and an assignment of the Prorise agreement.[3] Giller's attorney prepared the document under which SunSport assigned the sunbed development agreement with Prorise Investments to Gilcom, as well as the stock subscription agreement through which Peter and Sandra Mills became Gilcom shareholders. Giller's accountant received a copy of a memorandum in which the parties set forth the general terms of the asset transfer to Gilcom. However, no accountant or other professional ever performed due diligence or even reviewed the entire transaction to determine whether it would comply with applicable creditor protection laws.

SunSport transferred the following individual assets to Gilcom: inventory, the SunSport trade name, a trade show display, an ETL assignment, an FDA assignment, and the Prorise Development Agreement.[4] These last three assets, referred to collectively as "intellectual property," were essential to the sunbed manufacturing process. The lamps SunSport used in its beds were imported from Europe under a license that had to have ETL and FDA approval, and a manufacturing company will not produce a sunbed without FDA approval. The Development Agreement gave Gilcom the exclusive rights to research and development of the sunbeds. The total value of the assets SunSport transferred to Gilcom was $327,125.00, determined as follows: inventory—$242,125.21, SunSport trade name—$20,000.00, trade show display—$15,000.00, intellectual property—$50,000.00.[5] Gilcom paid SunSport a total of $240,129.00 in cash and other consideration for the inventory and paid no significant sum for the other assets.

---

**2.** According to Giller's testimony, the $300,000.00 was not used to purchase SunSport's assets but was used exclusively to buy parts for sunbeds.

**3.** There is other evidence which suggests that the asset transfer was not memorialized until a "transitional meeting" on June 28 and 29, 1997. In a record of this meeting, a SunSport employee notes that Mills is to produce a list of SunSport's assets so that Gilcom may prepare a bill of sale reflecting the asset transfer. The record of this meeting also indicates that Mills is to transfer the ETL and FDA assignments to Gilcom, to store assets located in Virginia in a local facility, and to transfer the SunSport name to Gilcom. However, the parties do not seem to dispute that the asset transfer effectively took place in early March 1997. Thus, the court finds March 7 and 8 as the dates SunSport transferred substantially all of its assets to Gilcom.

**4.** Defendants vigorously dispute that SunSport ever transferred the Prorise development agreement to Gilcom. They contend that SunSport's principals, Mills and Reczek, owned the agreement, and it was they who transferred it to Gilcom. Hence, they conclude that the value of this agreement must not be considered in the calculation of the total value of assets transferred to Gilcom. The court finds that this was one of the assets transferred from SunSport, as Mills and Reczek transferred it to that company when they formed it in July 1996.

**5.** According to the bill of sale Gilcom was to pay SunSport $162,000.00 for the following: inventory-$126,998.21; SunSport trade name-$20,000.00; trade show display-$15,000.00; ETL Assignment-$1.00; FDA Assignment-$1.00. Another document, which the trustee discovered while investigating SunSport's abandoned offices, valued the inventory at $242,125.21, due to higher volumes. The court's finding of $327,125.00 is based on the bill of sale, the second document the trustee discovered that set a higher value for the inventory, and the testimony and report of the trustee's expert witness as to the value of the intellectual property.

It was Giller's and Mills' original intention to execute an agreement whereby SunSport would be the exclusive and sole purchaser of SunSport sunbeds from Gilcom. The money due under the bill of sale was to be paid over three months as SunSport sunbeds were shipped to SunSport customers and as Gilcom received the wholesale cost of the beds from SunSport. Although this agreement was never executed, the parties did operate under its proposed terms until June 1997, when Giller decided to terminate Gilcom's relationship with SunSport.

From March 1997, when SunSport transferred all of its assets to Gilcom, until around the beginning of July 1997, SunSport operated as a sunbed distributor for Gilcom. During the period between the asset transfer in March and a Las Vegas tanning convention in late June 1997, SunSport ordered beds that Gilcom had manufactured and paid to Gilcom a total of $641,776.00. Yet entities that had been doing business with SunSport were not immediately informed that SunSport had transferred its assets to Gilcom or that the nature of its business had changed. SunSport's distributors were not aware of the asset transfer at the time of a meeting of distributors in May 1997.[6]

One month after the May distributor meeting, Gilcom representatives attended the Las Vegas tanning convention to promote the company's product. At this convention, all representations to the general public were that SunSport was still a viable entity. Gilcom employees worked at a trade booth that bore the SunSport name. However, at the same time, Giller was working behind the scenes to inform key employees and distributors that SunSport's bankruptcy was imminent and that Gilcom would take over as manufacturer and distributor of the SunSport sunbed. Giller sought to retain these employees to work for Gilcom. Giller took the position that Gilcom would not be responsible for any of SunSport's debts, warranties to customers, or other obligations; also, Gilcom would honor only warranties of beds which it sold from that day forward.[7] Giller also attempted to distance himself from Mills and Reczek by stating that Mills and Reczek would no longer be officers and directors of Gilcom or have any active part in Gilcom.

Despite Giller's statements, both Mills and Reczek attended a meeting on June 28 and 29, 1997, less than a week after the tanning convention, for the purpose of discussing the transition of the company formerly known as SunSport to Gilcom. Present in addition to Mills, Reczek, and Giller were Jill Edney and her husband, some SunSport employees, and an associate of Giller's who was investing in Gilcom. Those present made several crucial organizational decisions. It was understood at this meeting that the operating entity was Gilcom, and the employees were working for Gilcom. However, the decision was also made to continue to sell sunbeds under the SunSport name because of its recognition in the tanning industry. Former

---

6. One distributor testified that she was led to believe that nothing had changed about SunSport, that its financial condition was stable and that she was selling beds for it as before. She was unaware that Gilcom had entered the picture and was manufacturing the sunbeds.

7. The evidence shows, however, that Gilcom did in fact pay some of SunSport's debts.

Gilcom paid approximately $18,000.00 to Virgo Publishing, which represented SunSport's advertising debt. Gilcom settled another SunSport debt by delivering a sunbed to a customer. In addition, the trustee's expert testified that Patrick Reczek instructed Mr. Giller to pay SunSport debts totaling about $80,000.00.

SunSport distributors would continue as distributors for Gilcom. Other decisions included having Gilcom's distribution company trade as Simply Tan of America[8], along with committing to a one-year SunSport warranty to existing customers and to SunSport upgrades. In addition, Simply Tan was to pay some outstanding obligations of SunSport. Simply Tan and Gilcom had the same principals, and both companies used SunSport's phone numbers, web site, distributors, and employees.

Throughout the transition from SunSport to Gilcom and Simply Tan, there was confusion among employees over the extent of Mills and Reczek's involvement in Gilcom and over whether customers were continuing to deal with SunSport or with Gilcom. Employees were instructed to be somewhat oblique about the ongoing involvement of Mills and Reczek in the company. Customers who had a favorable reaction to them were to be told that they were still involved with Gilcom, and other customers were to be told that the two were no longer involved with the company. Similarly, a customer would either be told that SunSport was or was not involved with Gilcom, depending on the customer's previous reaction to SunSport.

There was also confusion created by Gilcom's and Simply Tan's accounting and billing practices. Prior to Simply Tan USA, Inc.'s, incorporation in September 1997, all of its transactions were conducted through Gilcom's checking account. Once Simply Tan was incorporated, bills sent to either SunSport or Gilcom would be paid by a check from Simply Tan's account.

Bills sent to Simply Tan would sometimes be paid by Gilcom and sometimes by SunSport.[9] All of Gilcom's and Simply Tan's transactions went through Simply Tan's accounts.

Peter and Sandra Mills and Patryk Reczek became officers and directors of Gilcom in March 1997. In addition, the Mills were 50% shareholders of the company. Peter Mills and Reczek were initially president and vice-president, respectively, of Gilcom, and Sandra Mills later became vice-president. At the time of trial in July 1999, Reczek was an officer and director of Gilcom, and Mills was an officer, director, and shareholder. After SunSport transferred its assets to Gilcom in March 1997, both Reczek and Peter Mills continued to work actively in various aspects of Gilcom's and SunSport's businesses. Mills and Reczek continued to have roles with Gilcom and Simply Tan even after the bankruptcy filing.

Around the time of the Las Vegas tanning convention in late June 1997, Jill Edney and her husband invested $150,000.00 in Gilcom and became 10% shareholders. As a consequence of this investment, the Mills' interest in Gilcom was reduced from 50% to 40%.

SunSport and Ultrabronz filed separate chapter 7 bankruptcy petitions in July 1997. However, the companies' connections with Gilcom and Simply Tan were not disclosed by the petitioners. SunSport listed only $4,819.17 worth of assets in its bankruptcy schedules.[10]

---

**8.** Simply Tan USA was incorporated in September 1997.

**9.** Chesapeake Engineering Corp., the company that manufactured the sunbeds for Gilcom, issued 75 invoices to Ultrabronz, SunSport, Gilcom, and Simply Tan. Some of the invoices that went to SunSport were paid by Ultrabronz, SunSport, or Gilcom. Similarly, some

of the invoices that were issued to Gilcom were paid by SunSport or Simply Tan, and some of the invoices that were sent to Simply Tan were paid by Gilcom.

**10.** From March through June 1997, SunSport's bank account statements reflected that approximately $900,000.00 to $1,000,000.00

Mills initially did not cooperate with SunSport's trustee in bankruptcy. He failed to turn over property of the estate, such as computers with important accounting information stored on them; he gave no indication that there was a California office, and the trustee only learned of this office when he fortuitously discovered a handwritten inventory from there. When the trustee visited SunSport's Richmond offices at Ridgefield Parkway, he discovered that everything, except for various discarded papers, had been removed. Mills later advised the trustee that the assets had been removed to Chesapeake engineering for the continuation of Gilcom's business and to the home of Mills' mother-in-law. The trustee's expert valued these assets at $3,625.00. SunSport's representatives never provided information regarding SunSport's inventory or original business documents to the trustee. Instead, they provided the trustee with recreated books and accountings which did not reconcile. The trustee had to obtain some documents through discovery, and even then there were no financial records relating to SunSport's accounting. The trustee tried to recover some information from one of SunSport's computers; however, the files had been erased. Finally, at the section 341 meeting of creditors, Peter Mills failed to disclose any of SunSport's asset transfers to Gilcom. The trustee did not learn of these transfers until September 1997, approximately two months after SunSport filed bankruptcy. Mills also affirmatively misled the trustee by denying that he was an officer or director of Gilcom.

Giller and Jill Edney, acting on behalf of Gilcom, negotiated checks payable to SunSport, Inc., after the SunSport and Ultrabronz bankruptcies had been filed. After the bankruptcy filings, the trustee had been passing through its account each month.

received a check from a leasing company, Med–Equip Leasing Income Fund X, also known as MTI Leasing, which had purchased two beds from SunSport in late June 1997. The trustee deposited this check, and MTI subsequently cancelled it. In response to the trustee's demand for repayment, MTI sent the trustee two checks which showed that they had already paid for the sunbeds. Giller had personally negotiated checks which were deposited into Gilcom's bank account, including at least two issued by MTI payable to SunSport, Inc. The first such check was issued by MTI on August 22, 1997, in the amount of $5,000.00 to SunSport, Inc., with the endorsement "PAY TO GILCOM CORP. OF VA., SUCCESSOR TO SUNSPORT, INC. BY EDWARD GILLER" The second check was issued by MTI on September 24, 1997, in the amount of $29,950.00 with a similar endorsement. The invoices for these beds were issued on June 19, 1997, by SunSport, Inc., and the checks were issued to SunSport, Inc.

The SunSport and Ultrabronz bankruptcy cases were substantively consolidated under the SunSport name by an order entered December 17, 1997, and plaintiff Kevin R. Huennekens has served as trustee for the consolidated case. In the order of consolidation, the court found that Ultrabronz and SunSport were affiliated subchapter-S corporations with common owners, officers, and directors. The court also found that in the year immediately preceding the filing of each company's bankruptcy case, all Ultrabronz assets were transferred to Sunsport without fair consideration and with the intent to hinder, delay, or defraud creditors.

*The Mills Settlement.*

Prior to the trial, the trustee reached a settlement with defendants Peter and San-

dra Mills. In the instant adversary proceeding, the trustee had alleged causes of action against the Mills for alter ego liability, avoidance of fraudulent transfers, avoidance of voluntary conveyances, avoidance of post-petition transfers, conversion, moneys had and received, breach of fiduciary duties, and violation of the automatic stay, and against Peter Mills individually for RICO violations and conspiracy. The settlement provided for the Mills to pay the trustee $115,000.00 and to deliver an affidavit regarding their current financial status. In exchange, the trustee and the Mills entered into an agreement that provided for the parties' mutual release from any and all claims that were or could have been raised in the bankruptcy case. The court entered an order approving the settlement on August 11, 1999, and a stipulation of dismissal was entered on November 19, 1999, dismissing the Mills as defendants.

As part of the settlement, the trustee agreed not to call the Mills to testify at trial.

*Discussion and Conclusions of Law*

*THE EVIDENCE*

Brief comment should be made concerning the evidence before the court. Critical testimony was given by the trustee and his expert witness and by Giller and Gilcom's expert witness. The available business records of SunSport were acknowledged by all to be woefully inadequate, a significant handicap for the trustee's case. Indeed, it appears likely to the court that there was a willful destruction or discarding of SunSport's records at around the time the bankruptcy was filed, and this factor has been taken into consideration in some of the court's findings.

Both expert witnesses were capable forensic accountants, and the court has carefully considered their testimony and re-

ports. As will appear, the court perhaps gave greater weight to the trustee's expert evidence, except in those situations where the paucity of records forced the court to conclude that his reconstructions were simply not sufficiently supported to sustain the trustee's burden of proof.

## I. Successor Liability

■ The court finds that the trustee has carried his burden of showing that successor liability should be imposed on Gilcom. Although not pled in the trustee's complaint, this ground is closely related to the grounds of alter ego and substantive consolidation alleged in Counts I and III. The trustee cites the Fourth Circuit opinion in *Kaiser Foundation Health Plan of the Mid–Atlantic States v. Clary & Moore, P.C.*, 123 F.3d 201 (4th Cir.1997) to support his argument that Gilcom is merely the successor of SunSport. Under Virginia law, a company that purchases or otherwise receives the assets of another company is generally not liable for the debts and liabilities of the selling corporation. *See Taylor v. Atlas Safety Equip. Co., Inc.*, 808 F.Supp. 1246, 1250 (E.D.Va.1992). However, there are four traditional exceptions to the general rule against successor liability: (1) the purchasing corporation agreed to assume the liabilities, (2) the circumstances surrounding the transaction warrant a finding that there was a consolidation or a de facto merger, (3) the purchasing corporation is merely a continuation of the selling corporation, or (4) the transaction is fraudulent in fact. *See Kaiser Foundation*, 123 F.3d at 204; *see also Harris v. T.I., Inc.*, 243 Va. 63, 413 S.E.2d 605, 609 (1992).

■ The *Kaiser* case provides an in-depth analysis of the continuation or single business entity theory. Although there is no absolute legal standard for determining

whether one corporation is in fact a mere continuation of another, courts in Virginia adhere to the traditional view and have identified numerous factors which can help in the determination. *See Crawford Harbor Assoc. v. Blake Constr. Co.*, 661 F.Supp. 880, 883 (E.D.Va.1987). The most critical element in proving a continuation is showing a common identity of the officers, directors, and stockholders in the selling and purchasing corporations. *See id.* Of these, identity of ownership is the most important component to sustain a finding of mere continuation. *See Taylor*, 808 F.Supp. at 1251. However, the Fourth Circuit has indicated that "absolutely identical ownership between the two corporations need not be present." *Kaiser*, 123 F.3d at 206. What is important is that the control of the two corporations be substantially the same. *See id.*

There is a substantial overlap in the ownership, the officers, and the directors of SunSport and Gilcom. The trustee's expert report shows that the shareholders and employees of Ultrabronz, SunSport, Gilcom, and Simply Tan are largely the same. The testimony shows that Mills and Reczek were the principals of SunSport, although it may be that Reczek cannot directly own stock because he is a resident alien. After the asset sale, Peter and Sandra Mills held 50% of Gilcom's 1000 shares as tenants by the entireties. Mr. Mills also became president and a director of that company, and Sandra Mills, who had been secretary treasurer of SunSport, became vice-president of Gilcom. Reczek also became a director of Gilcom and was to serve as vice-president if it was determined that he was eligible; he is currently listed as an officer.

A second and less important factor that courts consider in determining whether one corporation is a mere continuation of another is whether the new corporation continues in the same business as its predecessor. *See Crawford Harbor*, 661 F.Supp. at 885. This issue is not whether there has been a continuation of the seller's business operations but whether there has been a continuation of the corporate entity of the seller. *See Taylor*, 808 F.Supp. at 1251. The Fourth Circuit in *Kaiser*, in finding successor liability, found it significant that the successor law firm had the same attorneys, staff, telephone numbers, and clients as its predecessor. *See Kaiser*, 123 F.3d at 207. In this case, Gilcom had the same telephone number, employees, and for some time the same address as SunSport. In addition, Gilcom's business was very similar to SunSport's. Before selling its assets to Gilcom, SunSport was involved in the manufacture and distribution of sunbeds. It appears that immediately after the asset sale, Gilcom was to handle the manufacturing of the beds, and SunSport was to concentrate solely on selling them. However, this arrangement was essentially an informal understanding between Giller and Mills and Reczek; it was never reduced to writing. During the time that SunSport was supposedly Gilcom's marketing arm, Gilcom sometimes held itself out to the public as SunSport. At a tanning convention in June 1997, Gilcom employees manned a SunSport booth. Some customers and distributors who dealt with the company were told that they were still dealing with SunSport, while others were told that Gilcom no longer had any relationship with SunSport or its principals. Regardless of the true nature of SunSport's role in Gilcom after the asset sale, this role was short-lived. After Gilcom took over all of the business around July 1997, it distributed the beds under the trade name Simply Tan. Later, Simply Tan continued this activity as a separate corporation.

Only a few months after the asset sale, SunSport filed for bankruptcy, and what-

ever responsibilities it may have had became Gilcom's. The court is left with the impression that Gilcom and Simply Tan in fact did take over SunSport's business.

A third factor that courts consider in deciding whether a company is a mere continuation of its predecessor is the way in which the assets of the predecessor were transferred. If the transfer of the selling company's assets was done for less than adequate consideration and not in an arm's length transaction, the purchasing corporation is likely to be a mere continuation. *See Kaiser*, 123 F.3d at 207. Conversely, the Virginia Supreme Court has emphasized that a new corporation is *not* a mere continuation when the purchase of the seller's assets occurred in a bona fide, arm's length transaction. *See Harris*, 413 S.E.2d at 609. In *Kaiser*, the Fourth Circuit found that some assets were transferred to a successor law firm for less than adequate consideration, and others were transferred at arm's-length in bona fide transactions. *See* 123 F.3d at 207. On its face, the transaction between SunSport and Gilcom does not appear to have been arm's length because the Mills and Reczek were all with SunSport and then with Gilcom. The transfer had the appearance of a name change because the business and the key people were essentially identical. As established by the unchallenged testimony of the trustee's expert witness, this transaction was not at arm's length because Peter and Sandra Mills continued to own an interest in SunSport's assets as Gilcom shareholders even after the sale. In addition, Giller himself determined the price that Gilcom would pay for the assets. The result of this was that SunSport transferred ETL and FDA Assignments to Gilcom for only nominal consideration, and as discussed *infra*, SunSport did not receive the full value of other assets it transferred. The court finds that these facts indicate SunSport's assets were sold hastily and

not in an effort to get the best possible price for them. SunSport's president sold them to a company of which he knew he would become a 50% shareholder, and this was not a bona-fide, arm's length transaction.

A final consideration is whether two corporations or only one remain after the transaction, although a finding that the predecessor corporation remains after selling its assets is not fatal to a finding of successor liability. *See Blizzard v. Nat'l R.R. Passenger Corp.*, 831 F.Supp. 544, 548–49 (E.D.Va.1993). As discussed, SunSport did survive the asset sale to Gilcom in some form and had some business operations after March 7 and 8, 1997. Regardless of this fact, SunSport filed bankruptcy a few months later. For all practical purposes, only Gilcom and later Simply Tan remained after the asset sale.

To summarize the issue of successor liability, the facts paint a picture of SunSport transferring its assets to Gilcom at a time when creditors were threatening SunSport, and the company was struggling financially. Giller agreed to have his corporation purchase these assets at what he admitted was a "bargain" due to SunSport's circumstances. The plan was apparently for Gilcom to continue SunSport's sunbed manufacturing operations, while SunSport personnel would be responsible for selling these sunbeds. To this end, Gilcom took on former officers and shareholders of SunSport as officers, directors, or shareholders of Gilcom. Some SunSport employees became Gilcom employees; Gilcom initially took over SunSport's old offices at 10492 Ridgefield Parkway, and, of course, Gilcom received substantially all of SunSport's assets. SunSport's president, Peter Mills, and SunSport's secretary/treasurer, Sandra Mills, became shareholders of Gilcom. Thus there was a

continuity of ownership. Gilcom did take on some of SunSport's obligations and made payments to an advertiser and some of SunSport's critical vendors. Within months of the transfer of its assets to Gilcom, SunSport entered chapter 7 for the purpose of liquidating its remaining assets. These facts present a compelling case for imposing successor liability on Gilcom and its distribution arm, Simply Tan.[11] Accordingly, these corporate defendants will be held jointly and severally liable for SunSport's debt.

## II. Alter Ego and Substantive Consolidation

In Counts I and III of his complaint, the trustee essentially argues that the corporate defendants Gilcom and Simply Tan are alter ego corporations of each other and of SunSport, and thus should be held jointly liable for SunSport's debts. Furthermore, Gilcom and Simply Tan are merely alter egos of the individual defendants Edward Giller and Jill Edney and should not be regarded as distinct corporate entities. In a related argument, the trustee asserts that the individual and corporate defendants have extensively commingled their assets and business functions, such that a total separation of the entities would be impossible or not cost effective. Further, the individual and corporate defendants have failed to keep business records or observe necessary corporate formalities, and the individual defendants are using the corporate defendants to defraud creditors while enriching themselves. Thus, the court should consolidate the assets of the various defendants and allow SunSport's liabilities to be satisfied from these assets.

In essence, the trustee is asking the court to ignore any separateness or distinction between SunSport, Gilcom, Simply Tan, and the individual officers, directors, or shareholders of these entities. The court finds that doing so is warranted in the case of the corporate defendants Gilcom and Simply Tan but that insufficient evidence was presented to support a ruling that the corporate form ought to be disregarded as to the individual defendants. Under the alter ego doctrine, "when the corporation is the mere instrumentality or business conduit of another corporation or person, the corporate form may be disregarded." 1 William Meade Fletcher et al., *Fletcher Cyclopedia of the Law of Private Corporations* § 41.10 (perm. ed. rev.vol.1999). This doctrine allows a court to impose liability on a second individual or corporation when a plaintiff

---

11. The court notes that the facts surrounding the asset transfer to Gilcom also present all the elements of a de facto merger under Virginia law. A de facto merger is a judicial device for imposing liability on a successor corporation that has purchased only the assets of a selling corporation, so as to avoid succeeding to the liabilities. It is used in circumstances such as these, when the transaction seems to be, in essence, a merger rather than an asset sale, and creditors have been prejudiced. The elements of a de facto merger are:

(1) a continuity of the selling corporation's enterprise, including continuity of management, personnel, physical location, assets, and general business operations;

(2) a continuity of ownership because the purchasing corporation acquires the assets with shares of its own stock, which ultimately are held by the selling corporation's shareholders;

(3) prompt liquidation and dissolution of the selling corporation's business operations; and

(4) an assumption by the purchasing corporation of the selling corporation's obligations necessary for normal operation of the seller's business.

*Taylor v. Atlas Safety Equip. Co.*, 808 F.Supp. 1246, 1250–51 (E.D.Va.1992).

has made out a cause of action against a primary defendant corporation. *See id.* The case of two affiliated corporations, such as a parent-subsidiary relationship, presents "a common situation ripe for piercing the corporate veil." *Id.* If two corporations have an identity of corporate officers and shareholders, and in addition they commingle their assets and business affairs, a court may conclude that the technical legal separateness of the two entities should be ignored.

 In this case, the trustee offered evidence that Gilcom and Simply Tan are related companies that did not maintain separate identities. The evidence is undisputed that Simply Tan has the same officers, directors and shareholders of Gilcom. Prior to Simply Tan's incorporation in September 1997, Gilcom sold and distributed sunbeds using Simply Tan as a trade name. According to Giller, before it was incorporated all transactions of the two entities went through the Gilcom checking account, and after it was incorporated, all transactions went through the Simply Tan account. The trustee's expert testified that bills sent to either SunSport or Gilcom were paid by a check from Simply Tan's account, and bills sent to Simply Tan were sometimes paid by either Gilcom or SunSport. Based on this evidence, which was unchallenged, the court concludes that Gilcom and Simply Tan are not to be treated as distinct legal entities. Simply Tan was no more than Gilcom's extension and division of the business it acquired from SunSport, and so Simply Tan USA will be held liable jointly and severally with Gilcom for the liabilities imposed in this opinion.

### III. Piercing the Corporate Veil

 The more difficult question is whether the corporate veil should be pierced as to the individual defendants,

Giller and Edney. The Virginia Supreme Court has held that there is no single rule or criterion which is to be applied to determine whether piercing the corporate veil is justified. *See O'Hazza v. Executive Credit Corp.*, 246 Va. 111, 431 S.E.2d 318, 320 (1993). A plaintiff seeking to have a court disregard the corporate form must first establish that "the corporate entity was the alter ego, alias, stooge, or dummy of the individual sought to be charged personally." *Cheatle v. Rudd's Swimming Pool Supply Co., Inc.*, 234 Va. 207, 360 S.E.2d 828, 831 (1987). In order to make this showing, a plaintiff may offer evidence that the defendant has exercised undue domination and control over the corporation, such that the separate personalities of the corporation and individual no longer exist and to adhere to that separateness would work an injustice. *See Perpetual Real Estate Services, Inc. v. Michaelson Properties, Inc.*, 974 F.2d 545, 548 (4th Cir.1992). Relevant to this inquiry is evidence of whether the defendant observed corporate formalities, kept corporate records, whether there were other officers and directors, and whether personal assets were commingled with corporate assets. *See id.; Cheatle*, 360 S.E.2d at 831. A second inquiry is whether "the corporation was a device or sham used to disguise wrongs, obscure fraud, or conceal crime." *Cheatle*, 360 S.E.2d at 831. Thus, in order to pierce the corporate veil under Virginia law, a plaintiff must prove that the individual sought to be charged personally both dominated and controlled the corporation and also used it in some crime or fraud. *See Perpetual Real Estate*, 974 F.2d at 548. The decision whether to disregard the corporate form and impose personal liability is a fact specific determination, and each case requires a close examination of the factual circumstances surrounding the corporation and the acts in question. *See Greenberg v. Commonwealth of Virgi-*

*nia,* 255 Va. 594, 499 S.E.2d 266, 272 (1998).

In his complaint, the trustee seeks to hold Peter and Sandra Mills, Patryk Reczek, Giller, and Edney personally liable for corporate debt of Gilcom and Simply Tan to the debtor SunSport under the various grounds alleged in the complaint. The court has described elsewhere in this opinion the manipulations of these individuals surrounding the transfer of SunSport's business to Gilcom and Simply Tan. To summarize their actions, Mills, Giller, and Reczek arranged for a fraudulent transfer of SunSport's assets to Gilcom in March 1997. Mills, the essential owner of SunSport, became with his wife a stockholder and principal of Gilcom, while at the same time selling SunSport's assets to Gilcom for inadequate consideration. Reczek, an officer of SunSport, became an officer and director of Gilcom. Giller, who assumed control of SunSport's business operations through Gilcom, allowed SunSport to continue to sell and distribute the tanning beds, now manufactured by Gilcom. Several months later in June, after this arrangement had turned out to be unprofitable, Giller terminated SunSport's participation and transferred the remainder of its former business operations to Gilcom. Yet, customers were misled as to these events because Giller, Mills, Reczek, and a new investor, Edney, created confusion over the ownership and operation of the business. Customers who had a favorable relationship with SunSport were led to believe that it was continuing in the tanning bed business. Gilcom used SunSport's name, operated in its former business location, retained its employees and otherwise gave appearances of continuing SunSport's operations. Upon terminating SunSport's business, Giller and Gilcom disavowed liability for SunSport's debt except for that of selected, critical creditors. Finally, after SunSport filed bankruptcy, Giller and Edney received checks payable to SunSport for beds sold before bankruptcy and deposited the proceeds to Gilcom's account. Specific evidence showed that Giller received two checks (totaling $34,950.00) payable to SunSport for bed sales, which he endorsed payable to Gilcom as "successor to SunSport" and deposited to Gilcom's account.

Although the court would likely have reached a different result as to Peter Mills, the evidence for veil piercing is just not sufficient to hold Giller and Edney personally liable for Gilcom or Simply Tan's debt to SunSport.[12] Obviously, the transfer of Sunsport's business to Gilcom resulted in prejudice to SunSport creditors. Indeed, the transfer was a fraudulent conveyance. However, when Giller through Gilcom purchased SunSport's assets, he was not obligated to assume or be responsible for the SunSport debt. The fact that he paid less than what has been shown to be a fair price for the assets does not warrant piercing the corporate veil as to Giller, much less as to Edney, who came along later. As the Virginia Supreme Court held in *Cheatle,* a fraudulent conveyance from one corporation to another does not mean that the corporate veil ought to be pierced as to the individuals involved. *See* 360 S.E.2d at 831.

The trustee was unable to prove that Giller or Edney employed Gilcom or Sim-

---

12. The principal difference as between Mills and Giller is that Mills' fraudulent transfer of SunSport assets was an effective fraud as to SunSport's creditors for which Mills as the principal and corporate fiduciary of SunSport could be held accountable. On the other hand, Giller in purchasing SunSport's assets for Gilcom was looking for a good business deal. It would be more difficult to find that Giller owed a fiduciary duty to SunSport's creditors.

ply Tan for the purpose of defrauding SunSport's creditors or to commit a crime. And it has not been shown that Giller or Edney treated the assets of Gilcom as their own, commingled personal and corporate accounts, or that they disregarded corporate formalities to such a degree that the corporate form ought to be ignored.[13] Certainly Giller's actions with respect to SunSport were less than commendable. Indeed, his conduct, along with that of Mills, has resulted in this court's ruling that Giller's corporate entities are liable for all SunSport debt under alter ego and successor liability theories; this is itself an extraordinary and drastic result. However, the court is unwilling to extend these rulings to any of the individual defendants. Piercing the corporate veil is an area of the law where the observance of corporate formalities counts for much; one of the main purposes of the corporate form is to protect individuals from personal liability. Giller undoubtedly acted on behalf of his corporations, but it has not been persuasively shown that he disregarded formalities or treated the entities as his personal

bank. The evidence with respect to Edney and Reczek is even less compelling, and there is no serious basis for holding them personally liable.

Thus while there is evidence that the various corporations were interrelated and generally conducted business in such a manner that they should not be considered separate entities, this does not compel the court to find that Giller, Edney, or Reczek should be personally liable for corporate debt. The separateness of corporation and individual shareholder seems to have been maintained; the separateness of the various corporations was not. It is only the extraordinary case that warrants disregarding the corporate entity. *See Cheatle*, 360 S.E.2d at 831. Unfortunately for the trustee's case the available evidence does not establish those necessary extraordinary circumstances.

## IV. Fraudulent Conveyances

The trustee alleges that pursuant to 11 U.S.C. § 548(a)(1)(A) and (B),[14] as

---

13. There is undisputed evidence that at the time Gilcom was used to purchase all of SunSport's assets, Gilcom's articles of incorporation did not allow it to conduct this type of activity. Under the common law *ultra vires* doctrine, this meant that any tanning bed related contracts Gilcom entered into were void. *See* 4B *Michie's Jurisprudence of Virginia and West Virginia, Corporations*, § 218, at 359 (1999). The Court does not find that Giller's disregard of this corporate formality is sufficient to warrant piercing the corporate veil. While indicative of the general carelessness with which this transaction was constructed, the failure to amend the articles of incorporation did not, by itself, prejudice creditors. This oversight was corrected in October 1997.

14. § 548 Fraudulent Transfers and Obligations.

(a)(1) The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was

made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily—

(A) made such transfer or incurred such obligation with the intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted; or

(B)(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

(II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; or

(III) intended to incur, or believed that the debtor would incur, debts that would be

well as under section 55–80 of the Virginia Code [15], SunSport made fraudulent conveyances by transferring its assets to Gilcom. Section 548(a)(1)(A) of the Bankruptcy Code refers to intentionally fraudulent transfers, i.e., those which a debtor makes with the goal of putting assets beyond the reach of his creditors. Section 55–80 of the Virginia Code closely parallels this Bankruptcy Code provision. *In re Springfield Furniture, Inc.,* 145 B.R. 520, 535 (Bankr.E.D.Va.1992). Section 548(a)(1)(B) refers to transfers that are conclusively deemed fraudulent as a matter of law, i.e., if a transfer of assets fits the description in this section, it cannot be argued that the transfer was not fraudulent. The court examines the two Code provisions in order.

### 1. 11 U.S.C. § 548(a)(1)(A)

■■■■ This section requires the trustee to prove that the transferor acted with actual fraudulent intent. There are three distinct intents that the debtor may form: the intent to hinder, the intent to delay, and the intent to defraud, any one of which is sufficient to render the transaction fraudulent. *See 5 Collier on Bankruptcy* ¶ 548.04[1] (Lawrence P. King, ed., 15th ed.1999). The trustee need not prove the absence of good faith on the part of the transferee. Insolvency of the transferor is also irrelevant, as is the receipt of reasonably equivalent value in the exchange. *See id.* ¶ 548.04[3]. Rather, insolvency or the absence thereof on the part of the transferor is simply one additional factor to be taken into account when the court decides whether the trustee has established his

*prima facie* case. The trustee may establish this *prima facie* case, under both the Bankruptcy Code and Virginia law, by showing the presence of so-called "badges of fraud", those circumstances surrounding an allegedly fraudulent transfer that are indicative of a debtor's state of mind. *See In re Springfield Furniture,* 145 B.R. at 535.

■■■■ Both trustee and defendants seem to agree that the case *Hyman v. Porter (In re Porter),* 37 B.R. 56 (Bankr. E.D.Va.1984), correctly identifies the badges of fraud. They are:

(1) Retention of an interest in the transferred property by the transferor;

(2) Transfer between family members for allegedly antecedent debt;

(3) Pursuit of the transferor or threat of litigation by his creditors at the time of transfer;

(4) Lack of or gross inadequacy of consideration for the conveyance;

(5) Retention or possession of the property by the transferor; and

(6) Fraudulent incurrence of indebtedness after the conveyance. *See id.* at 63.

An additional badge of fraud that various courts have considered and which the court considers relevant here is the concealment of facts and false pretenses by the transferor. *See Brown v. Third Nat'l Bank,* 67 F.3d 1348, 1354 (8th Cir.1995). If the trustee shows that a certain number of these badges of fraud are present, then

---

beyond the debtor's ability to pay as such debts matured.

**15. § 55–80. Void fraudulent acts; bona fide purchasers not affected.-**
Every gift, conveyance, assignment or transfer of ... any estate, real or personal ... given with intent to delay, hinder, or defraud creditors, purchasers, or other persons of or from

what they are or may be lawfully entitled to shall, as to such creditors, purchasers or other persons, their representatives or assigns, be void. This section shall not affect the title of a purchaser for valuable consideration, unless it appear that he had notice of the fraudulent intent of his immediate grantor or of the fraud rendering void the title of such grantor.

there is a rebuttable presumption of fraud, and it becomes the defendant's burden to come forward with evidence that the transaction was actually made in good faith. *Temple v. Jones, Son & Co.*, 179 Va. 286, 19 S.E.2d 57, 60 (1942). However, the ultimate burden of proof remains with the trustee. *See* 5 *Collier, supra,* ¶ 548.10. The trustee and defendants disagree over how many badges must be shown before the burden shifts to the defendant to rebut a *prima facie* case. The trustee insists that only one shifts the burden, and defendants argue that a showing of one badge of fraud *may* shift the burden of proof. *See In re Springfield,* 145 B.R. at 534. Regardless of which one is correct, the court finds that the trustee has established at least four badges of fraud and created a presumption that the transfer of all of SunSport's assets was done for the purpose of defrauding creditors. Indeed, in their Proposed Findings of Fact the defendants concede that several badges of fraud are present, although they back away from this position in a later pleading. Hence, the burden of going forward with evidence to rebut the trustee's *prima facie* case shifted to the defendants.

The trustee has established that some of SunSport's assets were transferred for less than adequate consideration. The assets transferred to Gilcom were inventory, the SunSport trade name, a trade show display, ETL and FDA licenses, and the development agreement with Prorise. According to the bill of sale dated March 7 and 8, 1997, Gilcom agreed to pay SunSport $126,998.21 for the inventory, $20,000.00 for the SunSport trade name, $15,000.00 for the trade show display, and $2.00 for the ETL and FDA assignments. Gilcom also paid $1.00 for the Prorise agreement. Neither party employed an accountant or obtained any sort of apprais-

al of these assets prior to the sale. No one attempted to obtain a legal opinion as to whether the transaction would constitute a fraudulent conveyance or run afoul of other creditor protection laws. Defendants seem to agree with the trustee's charge that the transaction was poorly documented at best, and the amount of due diligence performed prior to the transaction was minimal. The trustee found a document in SunSport's trash which set the value of the inventory at $203,560.21, and his expert values the inventory alone at $277,127.00. In addition, the trustee's expert has valued the ETL and FDA assignments at $50,000.00.[16]

The Court finds that the ETL and FDA assignments, as well as the Prorise development agreement, were not transferred for adequate consideration. The trustee argues persuasively that these assets were essential to the manufacturing of the SunSport sunbeds as the beds could not be manufactured without them. Giller testified that the lamps used to manufacture the sunbeds were highly specialized and had to be imported from Europe under a license that had to have ETL and FDA approval. Giller also testified that he wanted to make sure that they were transferred, because they "insured that Gilcom was protected in the Environmental Manufacturing Process." The trustee also elicited on Giller's cross-examination that a manufacturer will not produce a sunbed without FDA approval. The development agreement was also a valuable asset, as it gave Gilcom the exclusive rights to research and development of the sunbeds. It seems clear that these assets had more than the nominal value assigned them in this transaction. The court finds that the trustee has established a badge of fraud as to the FDA and ETL assignments and the

16. The expert calculated the value of SunS- port assets as high as $568,913.00.

Prorise agreement, and as to these items the burden of proof shifted to the defendants to establish that this transfer was non-fraudulent.

In addition, the court finds that Gilcom never paid SunSport the agreed-upon $35,000.00 for the SunSport trade name and trade show display as reflected in the bill of sale. This is the only document produced that indicates the value the parties placed on these particular assets, and the court has accepted this as the correct consideration. This finding also shifts the burden of proof to the defendants.

As to all of the above assets, the defendants have presented little evidence to support their view of what took place. They simply make the very conclusory statement that Giller wanted to obtain the assets for a good price. This is no doubt true, but it does not demonstrate that SunSport received adequate consideration for the assets in question. Defendants have simply not adequately addressed the trustee's argument that they paid either nominal consideration, or no consideration at all, for several of the assets transferred to them. Instead, defendants presented the testimony of an expert witness who valued the assets as a bundle, using a return on investment analysis. This method values the assets based on the future streams of income that they could be expected to produce. While this is certainly an acceptable means of valuing assets in a transaction, the court finds it significant that the parties themselves did not purport to use this method at the time of the actual asset transfer.

The only evidence offered of any attempt to place a value on SunSport's assets was the bill of sale, which valued the assets individually, rather than as a bundle

that would produce revenue streams. Thus, it seems that looking forward, the parties had a general idea of what they believed each asset was worth, although as indicated, this court cannot agree that two of the assets had only nominal value. Furthermore, defendants' expert concluded that based on his valuation of the assets, Giller actually overpaid for them. This certainly indicates that the parties never intended to use the return on investment method of valuing the assets, for it is unlikely that Giller would have paid more than he thought the assets were worth. The court finds that defendants' method of valuing the assets is not a reliable measure of their apparent value at the time of the transaction. Accordingly, the court concludes that the trustee has established the badge of fraud of "grossly inadequate consideration" as to the ETL and FDA assignments, the Prorise agreement, and the SunSport trade show display and trademark.

The trustee has also established that the transferors of the assets in question, SunSport's principals Mills and Reczek, retained an interest in the assets after they had been transferred to Gilcom. The evidence is undisputed that Mills and his wife became 50% shareholders of Gilcom after the asset sale and that Reczek held a "beneficial interest" in these shares. Giller, Mills, and Reczek were all elected directors of Gilcom. Giller was elected to serve as Gilcom's chairman, Mills became Gilcom's president, and Reczek became vice-president.[17] The evidence suggests that Mills, if not Reczek, was involved in the daily operations of Gilcom. Mills participated in shareholder meetings, as well as in weekly or bi-weekly conference calls during which he and others made business

17. Sandra Mills was later substituted as vice-president, because of the assumption that Reczek, an alien, could not be an officer of a subchapter S corporation. However, according to Giller's testimony, Reczek is currently an officer and director.

decisions. Mills received correspondence from the company that manufactured the sunbeds, Chesapeake Engineering. He also sent an invoice and contract of sale to Jill Edney and requested information on the billing policy. Reczek, for his part, worked on sales for Gilcom, along with other employees. These facts establish another badge of fraud; even after they sold the assets, Mills continued to effectively own half of them as a shareholder of Gilcom. Reczek also had a continuing interest in them as an officer and director of Gilcom. Thus, the burden of proof shifted to defendants to establish that Mills' and Reczek's continued interest in SunSport's assets was not fraudulent.

Defendants explain this fact by stating that Prorise Investments, Inc., the company which licensed the rights to develop the sunbeds, demanded that Mills and Reczek become officers or directors of Gilcom before it would allow the assignment of the development agreement. Even accepting that this arrangement was at least in part dictated by legitimate business and legal constraints, the defendants have not overcome the circumstance of Mills' continued ownership in the transferee Gilcom.

The trustee has also established that SunSport's creditors were pressing very hard against the company at the time it transferred its assets to Gilcom. SunSport was formed for the purpose of manufacturing a high pressure tanning bed that was very similar to but cheaper than the Ultrabronz tanning bed. Shortly after SunSport began manufacturing this new bed, it became involved in a lawsuit with Barclay Leisure, the owner of the Ultrabronz tanning bed. Barclay Leisure alleged that the SunSport bed was a trade dress infringement and was in violation of the distributorship agreement entered into by Mills and Reczek. This suit was one of the factors that precipitated the transfer of all of SunSport's assets to Gilcom. Another factor was the undisputed fact that SunSport simply wasn't performing as well as its principals had hoped. It had incurred a great deal of debt simply because it was not selling sunbeds as quickly as it needed to in order to meet its obligations. These facts establish another badge of fraud, and the burden shifts to the defendants to show that the transfer was legitimate.

Defendants do not deny that SunSport had large debts at the time it was acquired by Gilcom. Defendants explain this, and the entire transfer of SunSport's assets to Gilcom, by saying that Mills and Reczek approached Giller in hopes that he would invest in their foundering company. They saw him as a "white knight" who would provide the cash infusion necessary to keep SunSport going. Originally, Mills and Reczek wanted a $600,000.00 investment that would allow them to manufacture, and ideally sell, 40 tanning beds. Giller was only willing to invest $300,000.00, and he was not willing to invest the money in SunSport directly. Instead, he preferred to make a capital contribution to Gilcom of $300,000.00 and use Gilcom to purchase all of SunSport's assets. The defendants have not presented sufficient evidence to rebut the trustee's assertion that these actions constituted fraud. They have merely confirmed that Giller did indeed offer to purchase all of SunSport's assets at a time when SunSport was in financial distress and unable to pay its bills.

Finally, the trustee has established that SunSport's principals were evasive, uncooperative, and actually concealed the asset transfer on SunSport's bankruptcy schedules. SunSport did not list any bank account statements, accounts receivable, or inventory in its schedules. It listed assets of only $4,819.00, despite the fact that just prior to the bankruptcy, SunSport's bank

account statements reflected that approximately $900,000.00 to $1,000,000.00 was passing through the accounts each month. Mills initially did not cooperate with the trustee in turning over property of the estate. He gave no indication that there was a California office, and the trustee learned of this office only when he fortuitously discovered a handwritten inventory from there. SunSport never provided information regarding its inventory or original business documents to the trustee. Instead, it provided the trustee with recreated books and accountings which did not reconcile. The trustee had to obtain some documents through discovery, and even then, there were no financial records relating to the company's accounting. The trustee tried to recover some information from one of SunSport's computers; however, files had been erased. Finally, at the 341 meeting, SunSport failed to disclose any of the transfers to Gilcom. The trustee did not learn of the asset transfer until September 1997, approximately two months after SunSport filed bankruptcy. Mills also affirmatively misled the trustee. When asked if he was an officer or director of Gilcom, he answered that he was not. Mills' conduct during SunSport's bankruptcy is certainly an indication that the transaction with Gilcom was a fraudulent conveyance. The defendants offer no evidence to explain this behavior, other than to argue that they should not be held responsible for Mills' actions. But this argument does not address the fact that the trustee's *prima facie* case focuses primarily on the transferor in the allegedly fraudulent transaction. Thus, defendants' argument does nothing to rebut the trustee's *prima facie* case.

In summary, the court finds that the trustee has carried his burden of proving that the transfer to SunSport was made with the intent to "hinder, delay, or defraud creditors", and was fraudulent under both 11 U.S.C. § 548(a)(1)(A) and section 55–80 of the Virginia Code. The transaction was obviously constructed very hastily and with hardly any regard for formalities. Giller, no doubt a shrewd businessman, saw an opportunity to avail himself of the assets of what had the potential to be a very profitable organization. Rather than making a loan or an equity contribution to SunSport, he decided to transfer all of the company's assets to a corporation that he controlled. This is not fraudulent conduct in and of itself, but the circumstances surrounding it clearly suggest fraud. Mills and Reczek stayed on as officers and directors of Gilcom after the asset transfer, and the Mills were 50% shareholders. The parties did not document the transaction well. No one even realized that Gilcom's articles of incorporation were originally not written broadly enough to allow it to manufacture or distribute sunbeds. It was not until seven months after the asset transfer that Gilcom's articles were amended to allow it to conduct "any lawful business" in Virginia. A lawyer and an accountant were, according to Giller, peripherally involved in the transaction and were sent copies of the parties' memorandum of understanding. However, there is no evidence that they expressed an opinion as to the reasonableness of the purchase price or as to whether the transaction would comply with applicable laws. Indeed, the court has already ruled, as a matter of law, that the transfer amounted to a violation of Virginia's Bulk Sales law. Perhaps a greater involvement of a lawyer or other professional would have avoided this outcome. Finally, and perhaps most tellingly, Mills, as SunSport's representative, was not at all forthcoming about his company's pre-bankruptcy activities and concealed the existence of the asset transfer.

## 2. 11 U.S.C. § 548(a)(1)(B)

Under this section, a transfer is constructively fraudulent if three factors

are present. The transfer must have been made on or within one year before the date of the filing of the petition. The debtor must receive less than reasonably equivalent value in the exchange. The transfer must be made while the debtor is insolvent, or have the effect of rendering the debtor insolvent. The insolvency test under the Bankruptcy Code is a balance sheet test; a debtor is insolvent when "the sum of the debts is greater than the sum of the assets, at a fair valuation, exclusive of property transferred with actual fraudulent intent, and property that may be exempted from the bankruptcy estate." 5 *Collier on Bankruptcy* ¶ 548.05[1][a] (Lawrence King ed., 15th ed.1999). In addition, under section 548(a)(1)(B)(i)-(ii)(II), the trustee may dispense with the insolvency portion of the analysis altogether. Instead, the trustee need only show that the debtor was engaged in, or about to be engaged in, business or a transaction for which any property remaining with the debtor was unreasonably small capital. A determination that the debtor has "unreasonably small capital" is a question of fact. The court finds that the transfer of the ETL and FDA assignments, as well as the Prorise development agreement, were fraudulent transfers pursuant to section 548(a)(1)(B). SunSport was left with no assets after this transfer was made and was thus rendered insolvent. The transfer was made within one year of the bankruptcy. The transfer of these assets was, as discussed, for less than reasonably equivalent value. Gilcom will be liable for the value of these assets.

### 3. 11 U.S.C. § 548(c) and Fraudulent Intent under Va.Code § 55–80.

Even if the trustee has established that a fraudulent transfer took place, the transferee may be protected and allowed to retain the transferred interest in the property. Section 548(c) provides an exception to the voidability of fraudulent transfers in favor of a transferee that takes for value and in good faith. *See* 5 *Collier, supra,* ¶ 548.07[2][a]. In the Fourth Circuit, the issue of good faith is determined based on a subjective analysis of the facts surrounding the transfer. *See Practical Investment Corp. v. Rellen (In re Practical Investment Corp.)* 95 B.R. 935, 942 (Bankr.E.D.Va.1989).

There are Virginia cases that have held the avoidance of a conveyance under section 55–80 of the Virginia Code also requires proof of fraudulent intent on the part of the transferee. *See Hyman v. Porter,* 37 B.R. 56, 64 (Bankr.E.D.Va. 1984). Fraudulent intent may be inferred from the circumstances surrounding the transfer. *See id.* In the words of the Supreme Court of Virginia, "it [is] sufficient to show that the grantee had knowledge of such facts and circumstances as would have excited the suspicion of a man of ordinary care and prudence, and put him upon such inquiry as to the bona fides of the transaction as would necessarily have led to the discovery of the fraud of the grantor." *Bank of Commerce v. Rosemary & Thyme, Inc.,* 218 Va. 781, 239 S.E.2d 909, 912 (1978) (*quoting Crowder v. Crowder,* 125 Va. 80, 99 S.E. 746, 748 (1919)).

The court finds that under both the federal and state standards, Giller as principal of Gilcom had the requisite lack of good faith and notice of SunSport's fraudulent intent in transferring its assets.[18] Many of the circumstances surrounding the transaction that have already

18. Moreover, because the trustee has established lished a fraudulent conveyance under state

been discussed support this finding. Giller knew Mills and Reczek before the transfer of all of SunSport's assets and knew that their financial situation was precarious. Specifically, he knew that a lawsuit was pending and that it was creating a great financial burden on the two men and their company. He certainly knew that SunSport's financial difficulties were the reason why SunSport was seeking an outside investor. He knew SunSport had liabilities, knew that it was transferring all of its assets to him, knew that it was essentially becoming dependent on Gilcom, and yet he took no steps to insure that he or his company would be protected. In constructing the transaction as hastily as he did, he violated the Virginia bulk transfer law and Gilcom's own articles of incorporation. Had the transaction been better documented, had there been some external due diligence, had attorneys or accountants played a more active role, the trustee's case would have been more difficult. But under the circumstances, the court can only conclude that Giller was on notice that the transfer would be fraudulent as to creditors, and he simply disregarded the laws designed to protect these creditors.

## V. Liability for Preference:

The trustee asserts that payments totaling $641,776.00 from SunSport to Gilcom between March 20, 1997, and June 4, 1997, satisfied all of the statutory requirements of preferences pursuant to 11 U.S.C. § 547.[19] This Section provides that payments a debtor makes to creditors while insolvent and within a specified period prior to the bankruptcy may be avoided. In this case, the trustee makes the undisputed assertion that Gilcom was an insider of the debtor and thus the applicable preference period is one year before the petition date. There are a number of "exceptions" in the preference statute, which exempt transfers from avoidance that might otherwise fall under the language of § 547(b). Two appear to be relevant to the facts here: the "substantially contemporaneous exchange for new value" exception, and the "payment of a debt incurred in the ordinary course of business" exception.[20] Here, the trustee does

---

law, pursuant to his powers under Section 544(b), the saving clause of Section 548(c) would not apply in any event.

**19. § 547 Preferences.**

(b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property-
 (1) to or for the benefit of a creditor;
 (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
 (3) made while the debtor was insolvent;
 (4) made-
 (A) on or within 90 days before the date of the filing of the petition; or
 (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and
 (3) that enables such creditor to receive more than such creditor would receive if-

(A) the case were a case under chapter 7 of this title;
(B) the transfer had not been made; and
(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

**20.** Section 547(c) reads:

(c) The trustee may not avoid under this section a transfer-
 (1) to the extent such transfer was
 (A) intended by the debtor and the creditor to or for whose benefit such transfer was made to be a contemporaneous exchange for new value given to the debtor; and
 (B) in fact a substantially contemporaneous exchange;
 (2) to the extent that such transfer was-
 (A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;

not offer any evidence other than the fact that over a brief span, SunSport paid Gilcom a sum of money for sunbeds. This does not necessarily indicate that a preference was made. As defendants point out, the evidence is just as consistent with the possibility that SunSport simply made payments for sunbeds in the ordinary course of business. Defendants are correct in their argument that there is no evidence of how much, if any, of the payments made to Gilcom were on account of an antecedent debt. The court finds that the trustee has not carried his burden of proof as to the preference count.

## VI. Objection to Gilcom's Proof of Claim

The trustee objects to Gilcom's proof of claim on the grounds that it fails to comply with the requirements of Bankruptcy Rule 3001 and has no supporting documentation. The proof of claim is in the amount of $257,963.92, and Gilcom claims that it is for sunbeds that SunSport purchased but never paid for. According to the Bankruptcy Code, a proof of claim is deemed allowed unless a party in interest objects. *See* 11 U.S.C. § 502(a). If there is an objection, the court must determine the amount of the claim; however, the court must disallow the claim of any entity that is a transferee of a transfer that is avoidable under 11 U.S.C. § 548. Because the sale of SunSport's assets to Gilcom was a fraudulent transfer under section 548, Gilcom's claim will be disallowed until it pays over the amount for which it is liable to the estate. *See* 11 U.S.C. § 502(d).

## VII. Damages for Violation of the Bulk Sales Act

Prior to trial the court determined, as a matter of law, that the transfer of all of SunSport's assets to Gilcom amounted to a violation of Virginia's Bulk Sales law. The only issue that remained for trial was that of damages. According to the trustee, Gilcom's liability would be equal to the amount of the assets transferred at the time of the transfer. The trustee's expert set the value of the assets at $568,913.00. The trustee argues that Gilcom should be liable for this amount, although at a minimum Gilcom must be held liable for $202,000.00, the amount Gilcom actually paid for the assets. Defendants contest the trustee's expert's conclusions about the value of the assets on a number of grounds. Defendants contend that the Prorise agreement, which the trustee argues was part of the bundle of assets transferred to Gilcom, was never actually property of SunSport's. Hence, it should not be included in the total value of those assets. Defendants also take issue with the trustee's expert's methodology and with the data he used to arrive at a valuation of the assets. They argue that their expert is the more reliable of the two; he was familiar with Gilcom's "track record", and his analysis was in keeping with how businesses that are going concerns are valued, whereas the trustee's expert's approach was "piecemeal." Finally, Defendants argue that any recovery should be offset by the $115,000.00 already recovered from the trustee's settlement with the Mills. This, they argue, would have the effect of reducing the trustee's claim to zero.

Under the current version of Virginia's Bulk Sales law, liability of the transferee is determined by reference to the amount of a creditor's claim, reduced by whatever amount the creditor would

(B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and

(C) made according to ordinary business terms.

not have collected even if the transferor had complied with the law.[21] It is the transferee's burden to establish the amount that the creditor would not have realized if the transferee had complied, and it is the creditor's burden to establish the validity and amount of its claim. *See* Va.Code Ann. § 8.6A–107(2) (Michie Supp. 1999).[22] The transferee's liability is also capped by a formula that takes into account the value of the assets transferred and the amount actually paid for them. *See* § 8.6A—107(4)(b). In the case of a bulk sale in which the assets include property other than inventory and equipment, liability is determined first by taking the net value of the inventory and equipment and doubling this amount. The net value is determined by reducing the value of the asset on the date of the bulk transfer by any liens that are enforceable against the asset. *See* § 8.6A—107(5).

In SunSport's bankruptcy, only two creditors have secured claims. One, The Equipment Leasing Company, claims a security interest in collateral described as "One Lot of Office Furnishings", and lists its secured claim at $16,038.07. The other, Family Fitness, claims it is owed $63,300.00 pursuant to a buyback agreement that it had with SunSport. Family Fitness does not provide any documentation indicating why it believes its claim is secured or in what collateral it claims a security interest. However, even assuming both claims are indeed secured, there is no indication that they are secured by assets that were part of the bulk transfer to Gilcom. The court has found that SunSport transferred inventory worth $242,125.21 to Gilcom. This inventory consisted mainly of various sunbed parts such as lamps and electrical components. None of the inventory transferred to Gilcom appears to have been the collateral in which Family Fitness and The Equipment Leasing Company claimed an interest. Thus, the Court finds that the net value of the inventory and equipment transferred to Gilcom was $242,125.21, and twice this number is $484,250.42.

This number is then reduced by any amount of the net contract price paid to the transferor which is allocable to the inventory and equipment. The portion allocable to inventory and equipment "is the portion that bears the same ratio to that part of the net contract price as the net value of the inventory and equipment bears to the net value of all the assets." § 8.6A–107(5). The court has found that the net value of the assets transferred to Gilcom was $327,125.00, representing inventory, SunSport Trade Name, Trade Show Display, ETL Assignment, and FDA Assignment. The net contract price is the

---

21. **Va.Code § 8.6A–107. Liability for Non-compliance**(1) Except as provided in subsection (3), and subject to the limitation in subsection (4):

. . .

(b) A buyer who fails to comply with the requirements of any other subsection of § 8.6A–104 with respect to a claimant is liable to the claimant for damages in the amount of the claim, reduced by any amount that the claimant would not have realized if the buyer had complied.

22. In an adversary proceeding such as this, the trustee pursues claims on behalf of creditors, and so has the burden of establishing the validity and amount of those creditors' claims for purposes of the Bulk Sales law. $4,283,023.59 in claims have been filed against the estate and the defendants have not disputed that this is indeed SunSport's prepetition liability to creditors. It is the defendants' burden to establish the amounts that these creditors would not have collected even if Gilcom had complied with the law. They have offered no evidence from which the court could conclude that they have carried this burden. Thus, the court will calculate the maximum amount for which the defendants could be liable under the law.

amount Gilcom actually paid to SunSport, $240,129.00. The Court finds damages against Gilcom in the amount of $306,516.27. This is derived from the amount of the net contract price allocable to inventory and equipment ("X") as follows:

X/$240,129 = $242,125.21/$327,125; X=$177,734.15.

Gilcom's liability for the bulk transfer would be capped at $484,250.42.— $177,734.15 = $306,516.27.

As indicated, the Court finds that Gilcom and Simply Tan's liability as SunSport's alter ego corporations includes the liability for violation of the Bulk Sales law. Thus, the two defendant corporations will not be liable for $306,516.27 on top of the amounts for which they are already liable under Counts I and III of the complaint and under the successor liability theory.

## VIII. The Remaining Counts

There are several other remaining counts: Count XI: turnover of property of the estate; Count XII: avoidance of post-petition transfers; Count XIII: conversion of the debtor's property; and Count XXII: violation of the automatic stay. There are some facts in the record which could support some of these allegations. For example, there is evidence that Giller and Edney cashed checks that were debtor's property. These included the two checks written by MTI Leasing, which purchased two beds from SunSport in late June 1997. The first check was issued by MTI on August 22, 1997, in the amount of $5,000.00 to SunSport, Inc., with the endorsement "PAY TO GILCOM CORP. OF VA., SUCCESSOR TO SUNSPORT, INC. BY EDWARD GILLER" The second check was issued by

MTI on September 24, 1997, in the amount of $29,950.00 with a similar endorsement. SunSport issued the invoices for these beds on June 19, 1997, and the checks were issued to SunSport, Inc. The filing of a bankruptcy petition creates a stay against "any act to obtain possession of property of the estate ... or to exercise control over property of the estate." 11 U.S.C. § 362(a)(3). Property of the estate includes "any interest in property that the estate acquires after the commencement of the case." 11 U.S.C. § 541(a)(7). Because the SunSport bankruptcy petition was filed in July 1997, these checks received in August and September became property of the SunSport bankruptcy estate. Giller's and Edney's negotiation of these checks constituted an action in violation of the automatic stay. Furthermore, all of SunSport's furniture, equipment, and supplies were apparently removed from SunSport's offices at Ridgefield Parkway and transferred to Gilcom or Simply Tan. Specifically, within three days of the filing of SunSport's bankruptcy, these assets were transferred to Chesapeake Engineering for use by Simply Tan in the operation of Gilcom's business and also to the home of Peter Mills' mother-in-law. The court finds that these assets had a value of $3,625.00 [23] and that SunSport received no consideration for them. The transfers, if occurring pre-petition, constituted fraudulent conveyances to Gilcom or Simply Tan. If occurring post-petition, they were in violation of the automatic stay and a post-petition transaction under 11 U.S.C. § 549. In either case, the trustee may recover the value of the property from Gilcom and Simply Tan under 11 U.S.C. § 550.

Because of the paucity of available records, the evidence is equivocal as to

---

23. This is the uncontradicted value at which the trustee's expert appraised these assets, and Peter Mills admitted to the trustee that

the assets were in fact removed from SunSport's Ridgefield Parkway offices.

some of the other assets which the trustee claims are unaccounted for and missing from the estate. The trustee tried to reconcile records of beds that SunSport had shipped with receipts coming in to SunSport. He worked from a recreated record of shipped sunbeds, which was supplied by Peter Mills, as well as records SunSport kept contemporaneously with its operations. From his analysis, the trustee concluded that SunSport apparently never received payment for approximately eleven beds. From this evidence the trustee argues that Gilcom converted these beds. However, the court finds that the evidence is simply not sufficient to support this contention. While Gilcom may have received payments belonging to SunSport, it is equally plausible that the customers who received the beds in question simply never paid for them.

Similarly, the trustee's expert made a calculation that there was $161,161.00 in unaccounted for cash that Gilcom and Simply Tan now owe to the estate. He arrived at these figures by reviewing seven sunbeds that SunSport shipped between June 23, 1997, the date of SunSport's last bank deposit, and July 31, 1997, 10 days after the bankruptcy filing.[24] According to this analysis, SunSport shipped seven of a certain type of sunbed during this period. These seven beds were multiplied by the average net selling price to determine the missing sales proceeds. The defendants' expert attacks the notion that any cash is

missing from the estate on several grounds. First, he notes that the trustee has accounted for $4,149,808.00 out of a total $4,395,018.00 in estimated sales.[25] This means that all but approximately 5.5% of the estimated cash has been accounted for, and such a small amount could be explained by the margin for error in the expert's methodology. Second, defendants' expert stated that the $161,161.00 figure assumes that beds shipped after Gilcom terminated its distribution relationship with SunSport were actually SunSport's beds. According to this witness, it is not accurate to include in SunSport's expected revenues bed shipments that occurred after the termination. The trustee's expert admitted on cross-examination that if these beds were not in fact SunSport's, the amount of revenue attributable to them would be zero. Third, defendants' expert faulted the trustee's expert for assuming, whenever he was unable to determine the model number for a bed SunSport had shipped, that it was the highest priced bed in SunSport's inventory. Because these beds accounted for only 77% of the total number of beds shipped for which model numbers were known, it would have been more appropriate to assume they comprised only 77% of the unknown beds. This adjustment would reduce the total cash missing by $79,466.00. Finally, the trustee's expert did not consider the possibility that any of the beds or other parts

24. This analysis was apparently done as a "reasonability check" on a second analysis that the expert performed to determine if any cash was missing from the bankruptcy estate. In this other analysis, the trustee's expert compared the cash that SunSport should have received since its inception to actual deposits received by its bank. The amount of cash SunSport should have received was arrived at by estimating the number of beds it had shipped, based on its records, its customers' records, and Chesapeake Engineering's records. According to this analysis, $245,209.00

in cash was unaccounted for. However, the expert essentially rejected this number in favor of the more conservative number he derived by focusing only on transactions between June 23 and July 31, 1997.

25. This criticism is aimed at the analysis in which the trustee's expert compares SunSport's total bank deposits over its existence with its estimated sunbed sales over that period.

shipped simply were never paid for. It is possible that if cash is unaccounted for, the explanation is simply that a customer did not pay an invoice. Thus, the court cannot conclude that any specific sum of cash is missing from the estate or that if any is missing, one of the defendants is liable.

### IX. Amount of Default Judgment Against Patryk Reczek

■ Having adjudged him in default, the court must determine an amount for which Patryk Reczek will be liable to the estate. In doing so, the court notes that the Fourth Circuit has cautioned that a default judgment should not be contrary to what the outcome after a full trial would have been. *See Augusta Fiberglass Coatings, Inc. v. Fodor Contracting Corp.*, 843 F.2d 808, 812 (4th Cir.1988). The court has determined that it would·be unwarranted to pierce the corporate veil in this case and hold the individual defendants liable for the actions they took as agents of the various corporate entities. This conclusion applies to Reczek, and the court finds no basis to hold him personally liable for any of the judgments determined in this opinion. Whether the trustee would have succeeded in establishing Reczek's personal liability under some other theory cannot be determined. The task of adjusting the amount of the default judgment is made more difficult by the fact that the trustee, in his pleadings or evidence, never quantified the amount for which Reczek might have been liable. Accordingly, the court can award the trustee only the attorneys fees and costs incurred in opposing Reczek's motion to vacate the default judgment.

A separate order will be entered.