In re SUMMIT PLACE, LLC, Debtor.

Lloyd T. Whitaker, Trustee
in bankruptcy for Summit
Place, LLC, Plaintiff,

v.

Mortgage Miracles, Inc., Defendant.

Bankruptcy No. 01–10562.
Adversary No. 01–1026.

United States Bankruptcy Court,
W.D. North Carolina.

Nov. 4, 2002.

**66**

## FINDINGS OF FACT and CONCLUSIONS OF LAW and ORDER

GEORGE R. HODGES, Chief Judge.

This matter is before the court on the bench trial of the Chapter 7 Trustee's Complaint against secured loan creditor, Mortgage Miracles, Inc., ("Mortgage Miracles") seeking: (1) avoidance of Mortgage Miracles' deed of trust on the debtor's real property pursuant to 11 U.S.C. § 548; (2) relief for unfair and deceptive trade practices pursuant to N.C. Gen.Stat. § 75–1 et seq.; and (3) relief for usury pursuant to N.C. Gen.Stat. § 1 24–10.1. After hearing the evidence presented and considering the arguments of counsel, the court has concluded that the Trustee has failed to establish a right to recover against Mortgage Miracles on any of his claims, and that Judgment should be entered in favor of Mortgage Miracles on all claims. In support of that, the court makes the following findings of fact and conclusions of law:

*Background Facts*

1.  The debtor, Summit Place, LLC, is the owner of a roughly 51 acre tract of land in Haywood County, North Carolina, which the debtor was developing as a residential subdivision. The debtor filed a Chapter 11 petition on May 23, 2001. Lloyd Whitaker was appointed Chapter 11 Trustee on October 17, 2001. The Chapter 11 case was converted to one under Chapter 7 on February 20, 2002, and Whitaker has continued as Chapter 7 Trustee.

2.  The plaintiff is the Chapter 7 Trustee for the debtor.

3.  The defendant, Mortgage Miracles, is a Florida corporation in the business of making high-risk/high-return loans to distressed entities. Its principal is Frank Valdini. Valdini described his company's business as "lender of last resort."

4.  Summit Place's sole member and principal was John Crowell. Crowell also operated a heavy equipment earth moving business as a sole proprietor using the trade name of "Traxs." Traxs did the site development for Summit Place.

5.  The 51 acre tract of land owned by Summit Place is named "Willow Estates". It consists of two parcels: "Parcel 1" is about 17 acres (less eight lots that were sold) and is the parcel where most of the site work was done; and "Parcel 2" is about 33 acres of mostly undeveloped land. All of this (less the eight lots) became property of the bankruptcy estate pursuant to 11 U.S.C. § 541.

6.  Crowell had caused a number of liens to be placed on the Summit Place property prior to the involvement of Mortgage Miracles. The liens, priority and rough amount of debt on each parcel was as follows:

| Parcel 1 | Parcel 2 |
|---|---|
| Community Bank ($139,000) | Soesbee ($400,000) |
| Soesbee ($400,000) | RCF ($40,000) |
| RCF ($40,000) | |

7. The value of the Summit Place property was the subject of conflicting opinions. The court finds that the most reliable evidence of the value at the time of the transaction in question was $1 million. The Trustee's opinion is that the property had a value of $600,000 or less, based on a preliminary report of a recent (and not yet published) appraisal of the property that he had commissioned. The Trustee believed that the value of the property was influenced by Crowell's damage ·to the property during development, the general economy and the poor reputation of the project in the local real estate community. He believed those factors affected the value of the property at the time of the Mortgage Miracles loan. Mortgage Miracles' principal, Valdini, believed that the property had a value of $1.5 million based on the county tax valuation, which he believed to be conservative. There was an appraisal prepared for a bank at the relevant time which valued the property at approximately $1 million. The court finds that this is the most reliable evidence of value since it was a professional appraisal made at about the time of the challenged transaction, and was made for the purpose of extending credit secured by the property. The court rejects the Trustee's opinion of value as speculative and retroactive; and rejects Valdini's opinion as based on an inherently unreliable county tax valuation.

8. Immediately prior to Mortgage Miracles' loan, Summit Place was in default in its payments on all of its obligations. It had sold no lots in a year and had no substantial cash. Both Community Bank and Soesbee had initiated foreclosure proceedings, and Summit Place was in imminent risk of losing the property to foreclosure. Crowell had negotiated with Branch Bank and Trust (BB & T) for a permanent loan to refinance all of Summit Place's debt. BB & T made a "Commitment Letter" to Summit Place dated March 23, 2001, for a loan of the lesser of $1.5 million or 75% of the appraised value of the property. The commitment was effective until April 6, 2001 and closing required by May 15, 2001. The stated purpose of that loan was to pay off Summit Place's existing debt on the property, reduce the balance owed to Traxs and to provide funds for completion of development of Willow Estates.

9. After some negotiation, on April 2, 2001, Summit Place and Mortgage Miracles entered into the transaction that is the subject of the Trustee's Complaint: Summit Place executed a Promissory Note to Mortgage Miracles in the face amount of $265,000. The Note was for a 90-day term and bore an interest rate of 18% per year (and a default interest rate of 50%). The Note was secured by a Deed of Trust on all of the Summit Place property in favor of Mortgage Miracles. Summit Place also paid to Mortgage Miracles a "participation fee" of $100,000. In consideration of all of that Mortgage Miracles extended a loan to Summit Place of "$265,000". Mortgage Miracles also bought Community Bank's Note (effectively staying its foreclosure) and obtained a Modification Agreement from Soesbee which delayed payment until closing of a loan by an institutional lender on June 30, 2001. At the closing of the "$265,000" loan, only $143,844.52 was actually disbursed: the sum of $110,422.32 was disbursed to Summit Place and the balance was disbursed for brokers fees, Crowell's attorneys fees and accumulated property taxes on the Summit Place property. Immediately after the closing of the subject transaction, Crowell converted the full $110,422.32 disbursed to Summit Place by causing a check to be drawn on Summit Place's account to Traxs Development and depositing that check into his personal account. Crowell listed the conversion of the

Summit Place disbursement to himself as a "loan" and used it to pay debts on his heavy equipment and to pay himself for "draws".

10. Immediately after the transaction, the liens on the Summit Place property in order of priority were as follows:

| Parcel 1 | Parcel 2 |
|---|---|
| Mort. Miracles ($139,000) | Soesbee ($400,000) |
| Soesbee ($400,000) | RCF ($40,000) |
| RCF ($40,000) | Mort. Miracles ($265,000) |
| Mort. Miracles ($265,000) | |

11. Subsequent to this transaction, the commitment by BB & T terminated and no refinancing was accomplished by Summit Place.

12. Summit Place filed its Chapter 11 petition on May 23, 2001 and initially attempted to reorganize. Some months later Crowell abandoned the Willow Estates project and relocated to New Mexico. Whittaker was appointed Chapter 11 Trustee in October 2001 and the Chapter 11 case was converted to a Chapter 7 liquidation case on February 20, 2002.

13. The Trustee testified that he does not believe that any prudent businessman would have entered into the transaction with Mortgage Miracles. The Trustee believes that Crowell was using this transaction to obtain cash for himself; and that Mortgage Miracles knew this was Crowell's intent and saw this as a way to get extraordinary fees and an opportunity to acquire the real estate of Summit Place. Consequently, the Trustee believes that Mortgage Miracles was a conspirator with Crowell by virtue of Valdini's "understanding" that Crowell needed cash and his taking advantage of that. While this makes interesting theory, the court finds insufficient evidence to support the Trustee's assertion that Mortgage Miracles was party in any way to Crowell's conversion of the cash disbursed to Summit Place.

14. The court finds that the debtor's transaction with Mortgage Miracles, while extraordinary, was under all of the then current circumstances a valid arms-length business transaction. Summit Place's circumstance at the time was dire: it owned about $400,000 in equity in the property (apparently almost $1 million based on the tax valuation); and it had a commitment for refinancing that would solve its current financial problems; but the property was in the process of being foreclosed by creditors which might be completed before refinancing was possible. Mortgage Miracles made a short-term loan to stop the foreclosures until the refinancing could be accomplished. There was no evidence of any other financing that was available to Summit Place. Mortgage Miracles was Summit Place's only alternative. In that circumstance, the terms of the transaction appear a reasonable (but costly) alternative to loss of substantial equity in the property. The loan to Summit Place bears an interest rate commensurate with the risk involved. The origination fee was not unusual. The "participation fee" was high, but was a necessary inducement because the amount earned even at 18% for only ninety days would be so small as not to justify the risk of the loan. That fee was in the nature of a share of the profits if the transaction proved successful. Valdini's "understanding" that Crowell would get the cash disbursed from the transaction is not probative of any conspiracy or other participation with Crowell's intentions or actions. It simply bespeaks Valdini's personification of Summit Place in the person of its principal, Crowell.

### Discussion

15. The Trustee contends that the transaction was a fraudulent transfer (1) pursuant to Section 548(a)(1)(A) because the transfer was made with the debtor's actual intent to hinder, delay or defraud creditors; (2) pursuant to Section

548(a)(1)(B) because the debtor received less than equivalent value for the loan in that Summit Place only received the benefit of payment of $17,000 in property taxes for its Note and Deed of Trust for $265,000 and Summit Place was either (i) insolvent at the time or became so as a result of the transaction, or (ii) was left with unreasonably small capital as a result of the loan, or (iii) intended to incur debts that would be beyond the debtor's ability to pay them as they matured. The Trustee seeks avoidance of Mortgage Miracles lien on the Summit Place property except to the extent of $17,000 which the Trustee contends is the only value derived by Summit Place from the transfer. The Trustee further contends that the transaction amounts to an unfair and deceptive trade practice by Mortgage Miracles pursuant to N.C. Gen.Stat. § 75–1 et seq., for which the Trustee is entitled to damages in the amount of $265,000—trebled. The Trustee further contends that the default interest rate of the transaction is usurious.

16. The Trustee, as plaintiff, bears the burden of proof on each claim. The court has concluded that the Trustee has failed to sustain the ultimate burden of persuasion on his claims. The court believes that the Trustee failed to sustain his initial burden of going forward with the evidence because his claims are based on his own opinions of ultimate facts, which is at best speculation. The Trustee is a man of unusual ability and has accomplished much in this case and in others, but his opinions here require an imaginative stretch which takes them beyond probative evidence into the realm of conjecture. In any event, even assuming the Trustee established a prima facie case, it was rebutted by the defendant's evidence which the court finds was more likely the explanation of the transactions and occurrences in this case. Discussion of the evidence on each of the Trustee's claims follows.

## I. *Fraudulent Transfer Claims*

17. Pursuant to Section 548, the Trustee may bring an action to avoid a fraudulent transfer made within one year before the filing of the bankruptcy petition in two situations: if the transfer was made with an actual intent to hinder, delay or defraud creditors; or, if the transfer was made while the debtor was financially unstable and the debtor received less than a reasonably equivalent value in exchange for such transfer or obligation incurred. 11 U.S.C.A. § 548(a)(1)(A)-(B)(2001). This Section prevents a debtor from engaging in transactions which have the effect of placing assets beyond the reach of creditors. *In re Feiler*, 218 B.R. 957, 962 (Bankr.N.D.Cal.1998). It recognizes two types of transfers: those that are made with an actual intent to hinder, delay or defraud, and those that are constructively fraudulent because the debtor did not receive a reasonably equivalent value in an exchange which is made while or has the effect of rendering the debtor insolvent. *In re Churchill Mortg. Inv. Corp.*, 256 B.R. 664 (Bankr.S.D.N.Y.2000).

### *Section 548(a)(1)(A).*

18. The trustee first seeks avoidance of Mortgage Miracles' deed of trust on the debtor's real property pursuant to § 548(a)(1)(A). Section 548(a)(1)(A) provides that:

> The Trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily made such transfer or incurred such obligation with the actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such

transfer was made or such obligation was incurred, indebted.

■ 19. The element of actual fraudulent intent requires a purposeful act intended to defraud creditors. *In re Ste. Jan–Marie, Inc.,* 151 B.R. 984, 987 (Bankr. S.D.Fla.1993). The elements of hinder, delay and defraud are three distinct elements which are viewed in the disjunctive, and a finding of any one would satisfy the requirements of the statute. *In re Mathern,* 137 B.R. 311, 326 (Bankr.D.Minn. 1992). However, the phrase must be read consistently and with the intent of the law in mind. *See Stratton v. Sioux Falls Paint and Glass (In re Stratton),* 23 B.R. 284, 287 (S.D.1982). Thus, any hinderance or delay must be fraudulent, as the law seeks to avoid transfers where the debtor attempts to prejudice the legal or equitable rights of creditors. *Id.*

■ 20. The question whether the debtor possessed the actual intent to hinder, delay or defraud is a factual one to be determined by the court based on the facts and circumstances surrounding the transfer. *In re Smoot,* 265 B.R. 128, 142 (Bankr.E.D.Va.1999). Because the determination of actual intent can be difficult, courts look to "badges of fraud" to determine whether the transfer was made with the intent to defraud creditors. *In re World Vision Entertainment, Inc.,* 275 B.R. 641, 656 (Bankr.M.D.Fla.2002). While not direct evidence of fraud, the concurrence of facts and circumstances, including the badges of fraud,[1]can lead to the conclusion that the debtor's conduct

was motivated by such fraudulent intent. *In re Cohen,* 142 B.R. 720, 728–29 (Bankr. E.D.Pa.1992).

■ 21. The Trustee bears the burden of proving the debtor's fraudulent intent by clear and convincing evidence. In re Osbourne, 124 B.R. 726, 728 (Bankr. W.D.Ky.1989). The presence of a single badge of fraud is not sufficient to establish actual fraudulent intent; however, the confluence of several can constitute conclusive evidence of an actual intent to defraud, absent significantly clear evidence of a legitimate supervening purpose. *In re McLaren,* 236 B.R. 882, 899 (Bankr.D.N.D. 1999). Mere suspicion of fraudulent intent does not suffice. *In re Ste. Jan–Marie, Inc.,* 151 B.R. 984 (Bankr.S.D.Fla.1993).

■ 22. A debtor's execution of a note secured by deed of trust is considered a "transfer of a debtor's interest in property" for purposes of the bankruptcy code and § 548. *Hughes v. Lawson,* 122 F.3d 1237, 1240 (9th Cir.1997). The note and deed of trust, which are the subject of the trustee's complaint, were executed on April 2, 2001, and the debtor petitioned for bankruptcy protection on May 23, 2001. Thus, the transaction in question falls within the one year look-back period of Section 548 of the bankruptcy code.

■ 23. The court finds that this transfer may not be avoided based on § 548(a)(1)(A) because the Trustee has failed to prove that *the transfer* was made with "actual intent" to hinder, delay or defraud for the following reasons:

---

1. A non-exhaustive list of badges of fraud includes: whether the transfer was to an insider; whether the debtor retained possession or control of the property after the transfer; concealment of the transfer; pending or threatened litigation against the debtor at the time of transfer; a transfer of substantially all of the debtor's assets; absconding by the debtor; removal or concealment of assets; reasonably equivalent value in exchange for the transfer; the debtor's insolvency at the time of the transfer; the proximity in time of the transfer to the incurrence of a substantial debt; and a transfer of substantial business assets to a lienor followed by a subsequent transfer of such assets to an insider of the debtor. *In re Kelsey,* 270 B.R. 776, 782 (10th Cir. BAP 2001).

24. The Trustee's claim suffers from a fundamental flaw since it largely focuses on Crowell's *conversion* of the proceeds of the transfer rather than the *transfer* itself. Section 548 allows a Trustee to seek to avoid a debtor's transfer when *"such transfer"* was made with actual intent to defraud. 11 U.S.C.A. § 548(a)(1)(A)(2001) (emphasis added). The Trustee demonstrated (at least for the purposes here) that Crowell converted approximately $110,000 of the proceeds of the Mortgage Miracles loan to pay personal obligations on some of his heavy equipment and "draws" for himself. The Trustee also showed that Crowell later moved to New Mexico and eventually went into hiding. But, that evidence relates to Crowell's conversion of the proceeds of the transfer and not to the transfer itself.

25. The Trustee argues as evidence of fraudulent intent that Crowell had intended to abandon Summit Place and abscond with the loan proceeds. The court, however, finds that Crowell's subsequent removal to New Mexico is not probative of fraudulent intent. The facts show that at the time of the transaction with Mortgage Miracles, Crowell was committed to the project. On April 2, 2001, when the transfer took place, Crowell was involved in solving Summit Place's financial problems. He had obtained a permanent loan commitment from BB & T, and through the Mortgage Miracles transaction had obtained interim funding to delay the pending foreclosures on the real estate until the BB & T loan could close. It was not until some time after the Mortgage Miracles transaction that his solution began to fail. The appraisal commissioned by BB & T established the value of the property to be about $1 million, and BB & T declined to refinance the project. But, even then, Crowell stuck with the project. He retained counsel and filed Chapter 11 (reorganization) bankruptcy petitions for

Summit Place (and for himself). He participated in those proceedings for several months. Ultimately, Crowell moved to New Mexico; the Trustee was appointed; the bankruptcy cases were converted to Chapter 7 liquidations; and Crowell disappeared. Those may be indications of a later fraudulent intent since none of that occurred until over four months *after* the transaction with Mortgage Miracles and after substantial effort by Crowell on Summit Place's behalf. Consequently, Crowell's removal and disappearance are not probative of an "actual intent to hinder, delay, or defraud" creditors at the time of the transaction with Mortgage Miracles.

26. The Trustee suggests as evidence of fraudulent intent that the transaction was imprudent. According to the Trustee, no prudent businessperson would have accepted the loan on Mortgage Miracles' terms. However, this assertion is based largely on hindsight and focuses on events that occurred after the transfer took place. Focusing on the circumstances of Summit Place immediately prior to and at the time of the transfer, the transaction does not appear so imprudent. Where a debtor's delay of creditors is motivated not by intent to defraud, but by a desire to continue in business, to rehabilitate financially, and to protect his credit standing, the transfer has been held not fraudulent notwithstanding the debtor's insolvency at the time of the transfer. *In re Stratton,* 23 B.R. at 287; see also *In re Owen J. Rogal, D.D.S., Ltd.,* 38 B.R. 677, 679 (Bankr.Pa.1984). Prior to contact with Mortgage Miracles, Summit Place was faced with the prospect of losing its real estate before it could refinance the project. The land had a tax valuation of $1.5 million, but was in the process of foreclosure because of Summit Place's inability to pay loans of less than half of that value. Sum-

mit Place had a written loan commitment from an institutional lender, BB & T, that would pay off the foreclosing creditors and refinance the project. But, Summit Place was unable to complete the refinancing in time and there was no evidence of any other source of funds. It contacted Mortgage Miracles through a mortgage broker and, ultimately, short term financing was arranged as a "bridge" to the refinancing. As part of the transaction Mortgage Miracles bought the Note of Community Bank, thereby stopping its foreclosure proceeding, and also obtained a Modification Agreement from Soesbee which delayed his foreclosure proceeding. Given that Summit Place's only other alternative was foreclosure of its land, the transaction with Mortgage Miracles does not seem imprudent. It was an expensive deal for Summit Place, but not imprudent under all of the circumstances. It certainly was not so imprudent as to be probative of an "actual intent to hinder, delay, or defraud" creditors. The court finds that although the transfer to Mortgage Miracles had the effect of delaying foreclosure proceedings, the delay was not done with fraudulent intent. Rather, the Debtor was motivated by a desire to continue in business, to rehabilitate financially, and to protect its credit standing.

27. The court further finds that the transaction between Summit Place and Mortgage Miracles was made for legitimate business reasons and with the intent to benefit creditors, not to defraud them. The fees paid to Mortgage Miracles were certainly high, but were reasonable given the risk undertaken by the lender. Even the "participation fee" was justified by the short-term nature and high risk of the loan, and amounted to a share of the profits if the venture succeeded. Though the cost of the transaction to Summit Place was high, there was anticipated benefit to the creditors in avoiding imminent foreclo-

sure, providing short-term funding of operations and providing a "bridge" to the chance for permanent refinancing.

28. The Trustee asserts that Mortgage Miracles was an implicit partner in the conversion of funds because Valdini "understood" that the proceeds would go to Crowell. For purposes of § 548, the Trustee must prove fraud on the part of the transferor, not of the transferee. *In re Rubin Bros. Footwear, Inc.,* 119 B.R. 416, 423. The court finds that Valdini's "understanding" is merely a demonstration of his disinterest in and disregard of the legal niceties of the corporate structure, and his personification of Summit Place as John Crowell, rather than a conspiracy between the two. Crowell was sole owner and sole operator of Summit Place. As such, Crowell was the person with whom Valdini had all of his dealings with respect to Summit Place. In fact, Crowell was member/manager of Summit Place and was the only person to direct the use of the loan proceeds for the benefit of Summit Place. Valdini appeared interested primarily in the terms of the transaction, and the court finds as true his explanation that he left the legal details to his lawyer. So, the court finds no significance to Valdini's statement that he "understood" Crowell was going to get the proceeds of Mortgage Miracles' loan. There is nothing, but speculation, from which to make the leap to the conclusion that Valdini knew that Crowell would misapply the proceeds of the loan to Summit Place, and the court declines to make that leap.

29. Based on the foregoing, the court finds that the circumstances surrounding the transfer preclude any reasonable conclusion other than the purpose of the transfer was not fraudulent as to creditors. The court concludes that the Trustee has failed to demonstrate that Mortgage Mira-

cles' lien should be avoided pursuant to 11 U.S.C. § 548(a)(1)(A).

### Section 548(a)(1)(B).

30. The trustee next seeks avoidance of Mortgage Miracles' deed of trust on the debtor's real property pursuant to 11 U.S.C. § 548(a)(1)(B). Section 548(a)(1)(B) provides that:

> The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily . . . (B)(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and (ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation; (II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; or (III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.

This Section is concerned with transfers under conditions from which fraud will be presumed in law despite lack of proof of actual intent to defraud. Such "constructive intent" is determined from circumstances surrounding the transaction.

31. The first requirement of Section 548(a)(1)(B) is that the transferor received "less than reasonably equivalent value" in exchange for the transfer. "Reasonably equivalent value" is a question of fact as to which the court is to be given considerable latitude to make a determination by considering all the facts and circumstances surrounding the transaction in question. *In re Bennett Funding Group,*

*Inc.,* 220 B.R. 743, 769 (Bankr.N.D.N.Y. 1997).

32. The Trustee argues that Summit Place received "less than reasonably equivalent value" for the lien it gave up because it received far less cash than the $265,000 Note. The court cannot accept the Trustee's purely "cash" value analysis, because to do so would potentially invalidate virtually every loan transaction; there are always fees associated with the loan and the borrower never gets in cash the full amount it borrows. Moreover, here, the Trustee's analysis would totally ignore the non-monetary benefits of Mortgage Miracles' purchase of the Community Bank Note and the Modification Agreement obtained from Soesbee. Rather, Summit Place received "reasonably equivalent value" because part of the "value" it received was the avoidance of foreclosure and the chance to survive until it had an opportunity to refinance its project. As noted above, that chance had substantial value to the debtor and creditors because it represented the difference between immediately losing nearly a half-million dollars in equity through foreclosure and in having a chance to refinance and complete the project. The court finds that based on all the circumstances surrounding the transaction, the transfer was not in exchange for less than reasonably equivalent value. Thus, the court concludes that the Trustee may not avoid the lien of Mortgage Miracles pursuant to 11 U.S.C. § 548(a)(1)(B).

33. Having found the Trustee failed to establish the element of "less than reasonably equivalent value," it is unnecessary to reach the second part of the section. But even assuming that the Trustee did establish the condition of Section 548(a)(1)(B)(i), none of the conjunctive requirements of (ii) have been established. These additional requirements of (I) insolvency, (II) unrea-

sonably small capital remaining or (III) likely inability to pay debts are all defeated by the existence of significant value and equity in Summit Place.

34. Insolvency is determined by a balance sheet test. *In re Sunsport, Inc.*, 260 B.R. 88, 116 (Bankr.E.D.Va.2000). A debtor is insolvent when the sum of the debts is greater than the sum of the assets. *Id.* "Unreasonably small capital" is met when the debtor was engaged in, or about to be engaged in, a business or transaction for which any property remaining with the debtor was unreasonably small capital. *Id.* Looking at the Summit Place balance sheet shows that the entity was not insolvent and was not left with unreasonably small capital. The Trustee offered hearsay evidence of a recent appraisal (as yet not finalized in October 2002) that indicated the Summit Place property had a value of only $600,000 over two years earlier, in April 2000. However, the persuasive evidence and the finding of the court is that BB & T's appraisal of the property just days after the Mortgage Miracles transaction established a value of about $1 million. That value belies insolvency or insufficient capitalization of Summit Place and supported Summit Place's ability to repay its debts as they matured (either from refinancing, development or sale of the real estate). Also, the loan commitment from BB & T to refinance the project supports a finding that the time of the transaction, Summit Place was not unlikely to pay debts as they became due. Consequently, the Trustee has failed to demonstrate the existence of any of the elements of 548(a)(1)(B)(ii).

## II. *Unfair and Deceptive Trade Practices, N.C. Gen.Stat. § 75–1 et seq.*

35. N.C. Gen.Stat. § 75–1.1(a) provides in pertinent part: "Unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful." "For purposes of this section, 'commerce' includes all business activities, however denominated..." *Id.* § 75–1.1(b). A practice is "unfair" when it offends established public policy and when the practice is unethical or unscrupulous, and is "deceptive" if it has a tendency to deceive. *Polo Fashions, Inc. v. Craftex, Inc.*, 816 F.2d 145 (4th Cir.1987). "Whether the practice is unfair or deceptive usually depends upon the facts of each case and the impact the practice has in the marketplace. The plaintiff need not show fraud, bad faith, deliberate acts of deception or actual deception, but must show that the acts had a tendency or capacity to mislead or created the likelihood of deception." *Walker v. Branch Banking & Trust Co.*, 133 N.C.App. 580, 515 S.E.2d 727 (1999).

36. The Trustee contends that Mortgage Miracles' loan to Summit Place is an unfair and deceptive trade practice because: Valdini did no "due diligence"; Mortgage Miracles acted as a predatory lender; and because it created a "win-win" situation for itself. The court finds no evidence to support the Trustee's assertion that anything Mortgage Miracles did amounts to an unfair and deceptive trade practice.

37. There was certainly nothing "deceptive" about Mortgage Miracles' actions or the terms of its transaction. Valdini set out the terms on which he would lend to Summit Place and those terms were accepted. Mortgage Miracles performed its obligations on exactly the terms that had been offered and accepted. There is no evidence of any misrepresentation or any deception whatsoever on the part of Mortgage Miracles. In fact, Mortgage Miracles' name itself discloses about all anyone would need to know about what they were dealing with. Valdini described

his business as a "lender of last resort" that made high risk loans at high rates of return. Valdini did not do "due diligence" in the traditional manner of an institutional lender, but he did ascertain the facts that were important to Mortgage Miracles and on which he could make decisions. All of the actions that Mortgage Miracles took were known to all parties and were straightforward. The Trustee has failed to demonstrate any deception of any kind by Mortgage Miracles.

38. The terms of Mortgage Miracles' loan are certainly expensive, but they are not predatory nor unconscionable nor unfair. Summit Place was not without bargaining power or other options—in fact, a few weeks later it exercised one of its options when it filed this bankruptcy case. That Mortgage Miracles did not enjoy a "win-win" position is demonstrated by the fact that its money loaned on a ninety-day Note has now been uncollected for over eighteen months and that its security may be of much less value than it thought. The court finds that Mortgage Miracles' fees and rates here are not such that they constitute an unfair trade practice.

39. For these reasons the court finds that the Trustee has failed to demonstrate that Mortgage Miracles actions or its terms were unfair or deceptive trade practices pursuant to N.C. Gen.Stat. § 75–1 et seq.

### III. *Usury, N.C. Gen.Stat. § 24–10.1*

40. N.C. Gen.Stat. § 24–10.1 sets maximum fees on loans secured by real property. N.C. Gen.Stat. § 24–9 provides that: [n]otwithstanding any other provision of this Chapter or any other provision of law, any foreign or domestic corporation, limited liability company, or partnership substantially engaged in commercial pursuits for pecuniary gain may agree to pay, and any lender or other person may charge and collect from the entity, interest, fees, and other charges at any rate which the entity may agree or be required to pay and as to any such transaction the claim or defense of usury by the entity and its successors or anyone else in its behalf is prohibited.

41. North Carolina's usury statute does not apply to business loans between corporations. The Trustee suggested that the court should treat this loan as a loan to an individual. There is no basis for ignoring the structure of the transaction or the clear language of the statute, and the court declines to follow the Trustee's suggestion. The Trustee is not entitled to recover anything pursuant to N.C. Gen.Stat. § 24–10.1.

### *Conclusion*

42. For the foregoing reasons, the court has concluded that the Trustee has failed to establish his entitlement to recover on any of his claims, and that judgment should be entered for Mortgage Miracles on all claims.

It is therefore **ORDERED** that:

1. The plaintiff shall have and recover nothing from defendant;

2. The plaintiff's Complaint is dismissed; and

3. That judgment shall be entered for defendant on all of plaintiff's claims for relief.