In re William Lawrence
LENEVE, Debtor.

Soneet R. Kapila, Chapter
7 Trustee, Plaintiff,

v.

WLN Family Limited Partnership and
Carlayne Holloway, Defendants.

Bankruptcy No. 03–36439–BKC–PGH.
Adversary No. 04–3014–BKC–PGH–A.

United States Bankruptcy Court,
S.D. Florida.

March 8, 2006.

Kenneth B. Robinson, Rice Pugatch Robinson & Schiller, P.A., Fort Lauderdale, FL, for Plaintiff.

Kevin C. Gleason, Kevin Gleason, P.A., Hollywood, FL, for Defendant Carlayne Holloway.

***MEMORANDUM OPINION, FINDINGS OF FACT, AND CONCLUSIONS OF LAW***

THOMAS S. UTSCHIG, Bankruptcy Judge.

This bankruptcy case began when the debtor filed a chapter 7 petition in the Western District of North Carolina on September 23, 2003. The North Carolina bankruptcy court transferred the case to the Southern District of Florida on November 12, 2003. Thus began what is clearly a long and tortured investigation into the debtor's business affairs. As the trustee states in his direct testimony, from the outset the case has represented "a tangled web." Sir Walter Scott once famously observed, "Oh, what a tangled web we weave, when first we practice to deceive." This case easily illustrates how others can become ensnared in that web of deception. According to the trustee, he and his professionals have identified some 23 distinct corporations, limited partnerships, limited liability companies, and other entities over which the debtor had some level of control, if not outright ownership. How, and to what extent, the defendant Carlayne Holloway became involved in the debtor's schemes is the issue now before the Court.

The trustee believes that the debtor engaged in a fraudulent pattern of conduct regarding his assets, and that Carlayne Holloway assisted him in some manner. Certainly it is clear that the debtor's business dealings were murky at best, and the present adversary proceeding is but one of the many disparate threads the trustee has pursued in an effort to recover assets for the benefit of creditors. The principal question before the Court at present is whether the trustee has successfully proven the existence of a series of fraudulent transfers by the debtor (or on the debtor's behalf) to the defendant, Carlayne Holloway. In that regard, the trustee seeks to recover a total of $957,215.00 in purportedly fraudulent transfers from Holloway.

Both 11 U.S.C. § 548(a)(1)(A) of the bankruptcy code and Fla. Stat.

§ 726.105(1)(a)[1] permit a bankruptcy trustee to avoid transfers of a debtor's property if those transfers were made with the actual intent to hinder, delay, or defraud the debtor's creditors. Under 11 U.S.C. § 548(a)(1)(B) and Fla. Stat. § 726.105(1)(b), a trustee may likewise avoid a transfer if the debtor received "less than a reasonably equivalent value" in exchange for the transfer and the debtor was insolvent or otherwise financially impaired at the time of the transfer.

In order to prove that a fraudulent transfer has occurred under § 548(a)(1)(A) or Fla. Stat. § 726.105(1)(a), the plaintiff must demonstrate several things. First, the plaintiff must prove that a transfer of property has in fact occurred. Second, the plaintiff must prove that the property transferred belonged to the debtor. Third, the plaintiff must prove that the transfer occurred within certain statutory time periods. And fourth, the plaintiff must demonstrate that the debtor made the transfer with the intent to hinder, delay, or defraud creditors. See *Martino v. Edison Worldwide Capital (In re Randy)*, 189 B.R. 425, 440 (Bankr.N.D.Ill. 1995); *In re Ingersoll*, 124 B.R. 116, 120 (M.D.Fla.1991). The purpose and policy of both the state and federal provisions is to preserve assets of the estate for the benefit of creditors. *Solomon*, 300 B.R. at 63. Essentially, the fraudulent transfer provisions prevent the debtor from engaging in transactions which have the effect of placing assets beyond the reach of legitimate creditors. *Whitaker v. Mortg. Miracles, Inc. (In re Summit Place, LLC)*, 298 B.R. 62 (Bankr.W.D.N.C.2002).[2]

The defendant, Carlayne Holloway, concedes receiving certain amounts from the debtor's various entities within the proscribed time periods. However, issues exist as to whether Mrs. Holloway actually received all of the transfers alleged by the trustee. Further, Mrs. Holloway contends that she invested money in the debtor's business, and that his repayment of the debt does not indicate fraudulent intent. In that regard, however, it must be remembered that it is the debtor's intent, not the transferee's intent, which is critical in determining whether a transfer is fraudulent. *In re Metro Shippers, Inc.*, 78 B.R. 747, 752 (Bankr.E.D.Pa.1987).

Under both § 548(a)(1)(B) and Fla. Stat. § 726.105(1)(b), the plaintiff must prove that the debtor did not receive "reasonably equivalent value" in exchange for the transferred property. What con-

---

1. Pursuant to the powers granted the trustee under 11 U.S.C. § 544(b), a bankruptcy trustee may avoid any transfer of an interest of the debtor in property which is "voidable by any actual unsecured creditor under state law." See *Leibowitz v. Parkway Bank & Trust Co. (In re Image Worldwide)*, 139 F.3d 574, 576–77 (7th Cir.1998). Consequently, in this case the trustee may utilize the Florida Fraudulent Transfer Act in an effort to avoid the transfers in question. The state fraudulent transfer provisions are essentially identical to those found in the bankruptcy code, with the exception that there is a longer statute of limitations under state law. *Stillwater Nat'l Bank & Trust Co. v. Kirtley (In re Solomon)*, 300 B.R. 57 (Bankr.N.D.Okla.2003). The trustee's claims under both sections may therefore be analyzed simultaneously. See *Levit v. Spatz (In re Spatz)*, 222 B.R. 157, 164 (N.D.Ill.1998) ("Because the provisions of the UFTA parallel § 548 of the Bankruptcy Code, findings made under the Bankruptcy Code are applicable to actions under the UFTA"); *Feltman v. Warmus (In re American Way Serv. Corp.)*, 229 B.R. 496, 529–30 (Bankr.S.D.Fla. 1999) (the Florida fraudulent transfer provisions are "nearly identical" to those found in the bankruptcy code).

2. As one court stated recently, the "fundamental obligation" of a debtor seeking bankruptcy protection is to be forthright with the court, creditors, and the trustee. *In re Khanani*, 2005 WL 2482392 (Bankr.M.D.Fla.2005).

stitutes "reasonable value" is not statutorily defined. However, among the factors considered by courts include the good faith of the parties, the disparity between the fair value of the property and what the debtor actually received, and whether the transaction was at arm's length. *See Washington v. County of King William (In re Washington)*, 232 B.R. 340 (Bankr. E.D.Va.1999); *Heritage Bank v. Steinberg (In re Grabill Corp.)*, 121 B.R. 983, 994 (Bankr.N.D.Ill.1990). As the court stated in *Steinberg*, in determining whether the debtor received reasonably equivalent value, the essential examination is a comparison of "what went out" with "what was received."

The facts are as follows. As has been documented by the trustee, the financial dealings of the debtor may fairly be characterized as questionable. He established over 20 companies and seemingly transferred funds and assets between these various entities without much regard for corporate form. LeNeve was involved in a variety of real estate and other business ventures, many of which involved the solicitation of investment funding from third parties.[3] LeNeve has conceded that he exercised "dominion and control" over a variety of entities, including WLN Family Limited Partnership, Government Receivables Factoring Limited Partnership, Haverhill, PMS, Real Partners Limited Partnership, and others. He acknowledges that these entities had "no discretion" regarding the funds deposited in their names, and that they simply took direction from him as to how those funds would be spent or otherwise dispersed. The record conclusively establishes that LeNeve acted with little concern for the formalities of corporate governance, preferring instead to shift funds from entity to entity as part of a transactional shell game.

During the trial, the trustee asserted that the debtor had engaged in a general scheme or course of conduct designed to hinder, delay, or defraud creditors. In support of this argument, the trustee pointed out that in July of 2002, a $9 million consent judgment was entered against LeNeve and several other named defendants, including Mrs. Holloway's son Greg and his wife, Laura Andre. Likewise, in December 2001, an arbitration panel rendered an award against LeNeve in excess of $4 million. That award was confirmed in a state court proceeding in January 2003. From the trustee's perspective, LeNeve was clearly aware of all of these pending claims, and the likelihood of ultimate liability, when he made these transfers to Carlayne Holloway in 2002 and 2003.

These transfers were made by several different LeNeve-controlled entities, including Jefferson Capital, Partnership Mgt., WLN, and Haverhill Palm.[4] The transactions targeted by the trustee total $957,215.00. Carlayne Holloway acknowledges receipt of virtually all of the transfers. Notably, however, she contests receipt of a $450,000.00 transfer made from

---

3. Part of his business involved the "factoring" of various governmental contracts given to minority contractors; according to LeNeve, such contractors could pass the factoring costs on to the government and ultimately the taxpayers. LeNeve acknowledges that he promised investors, such as Mrs. Holloway, that they might receive more than a 20% annual rate of return on their investments with him.

4. For example, Jefferson Capital made three transfers to Mrs. Holloway totaling $260,000.00 in addition to the $450,000.00 transfer she denies receiving. Partnership Mgt. transferred $186,215.00 to her, while WLN and Haverhill Palm made several smaller transfers, none larger than $20,000.00.

Jefferson Capital on or about September 17, 2002.[5] In his testimony, LeNeve says that he "believed" the transfer was to have been for the benefit of Carlayne Holloway but he has no "personal knowledge" of that fact.

Carlayne Holloway denies that she ever owned an account at Compass Bank in Texas, the bank to which this transfer was wired pursuant to LeNeve's directions. She also emphatically says that she has never had a bank account anywhere in the state of Texas, nor does she have any record of this transfer or any knowledge of how she might have received the funds in the Compass Bank account. To support his position, the trustee introduced the testimony of Patrick Wilhelm Francois Toothe, the manager of a law office in Nassau, Bahamas, who indicated that LeNeve instructed him to wire the funds to the Compass Bank in Houston, Texas for a borrower named "Holloway."

█ The resolution of this issue is one of the significant components of this case. And the determination the Court is required to make is whether the trustee has demonstrated, by the proverbial preponderance of the evidence, that Carlayne Holloway received these funds. Clearly, Toothe's testimony reveals that the funds were in fact wired to a bank account in Houston, Texas. And there is also a bit of conflict in the testimony about why this sizeable sum was in fact sent to this seemingly obscure bank.[6] The trustee did not introduce any evidence, however, to show that the bank account in question was in fact owned by Carlayne Holloway. While

the trustee doubts that the funds would have been wired to an "unknown recipient," it seems incumbent upon the plaintiff to demonstrate, as part of its case in chief, actual receipt of the transferred funds, be it directly by the defendant or simply by the transfer into an account over which she had dominion and control.

As indicated at the outset, one of the essential elements which must be proven by the plaintiff in a fraudulent transfer action is the existence of the transfer itself. If it is the plaintiff's burden to demonstrate that a transfer has taken place, it is axiomatic that for purposes of liability, the plaintiff must also prove that the transfer was in fact made to the defendant in question. As the court stated in *Barr v. Weber (In re Carousel Candy Co.)*, 38 B.R. 927, 937 (Bankr.E.D.N.Y.1984), an action for a fraudulent transfer lies against the "initial, immediate or mediate transferees, or the beneficiaries of such transfers—*all persons in whose hands assets of the debtor come to rest.*" (Emphasis added.)

The code does not specifically define who may be an "initial transferee" for purposes of liability, and it is often difficult to determine liability when the initial transferee is not the intended recipient but merely someone entrusted to receive payment on behalf of the intended beneficiary. In an effort to resolve this issue, many courts have adopted the so-called "dominion and control" test, which provides that the "minimum requirement" before a defendant may qualify as a transferee for purposes of liability under these statutes is "dominion over the money or other asset,

---

5.  She also contests receipt of a $2,000.00 transfer made on December 3, 2002. For reasons which follow, the defendant's receipt of this transfer is not determinative of any issues, and consequently shall not be factored into the decision.

6.  For example, LeNeve says that the funds were wired to Compass Bank pursuant to the instructions of Greg Holloway, Mrs. Holloway's son. Greg Holloway, however, denies giving LeNeve any such instructions and also denies doing business "personally" with LeNeve.

the right to put the money to one's own purposes." *See Christy v. Alexander & Alexander Inc. (In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey)*, 130 F.3d 52, 58 (2d Cir.1997); *Bonded Fin. Servs. v. European Am. Bank*, 838 F.2d 890 (7th Cir.1988). In other words, to incur liability, a party "must have exercised a degree of dominion and control over the property transferred, or held some sort of beneficial right in it." *IBT Int'l, Inc. v. Northern (In re Int'l Admin. Servs.)*, 408 F.3d 689, 707 (11th Cir.2005); *see also, Geltzer v. D'Antona (In re Cassandra Group)*, 312 B.R. 491, 496 (Bankr.S.D.N.Y.2004); *Cuthill v. Kime (In re Evergreen Sec., Ltd.)*, 319 B.R. 245 (Bankr.M.D.Fla.2003).

■ In the present case, the trustee has demonstrated that the debtor directed that funds be sent from one of his entities to an account in Texas. Consequently, the existence of the transfer itself has been established. But Mrs. Holloway categorically denies ever having a bank account in Texas. While LeNeve is admittedly vague as to why the transfer took place, and there is a notation about a "borrower" named Holloway on the information provided by his agent in the Bahamas, this is clearly insufficient to demonstrate "dominion and control" over the funds by Mrs. Holloway. The debtor could have transferred the funds into this account for any number of undisclosed reasons, and to any number of undisclosed recipients; the trustee has not demonstrated that Mrs. Holloway received the funds or that she had actual or beneficial control over them. On this point, therefore, the Court can do nothing else but conclude that the trustee has not provided sufficient evidence that the defendant received the $450,000.00 transfer; consequently, as the trustee has not met

his burden of proof, the Court must find for the defendant.

■ This still leaves the balance of the challenged transfers, which total $507,215.00. On this issue, the defendant admits receiving approximately this much from LeNeve. However, she contends that the transfers were related to his repayment of her investment in his business. According to Mrs. Holloway, she had loaned a sizeable amount of money to her daughter-in-law, Laura Andre. Andre notified Mrs. Holloway that she had made a substantial profit on a business venture and was prepared to repay the loan. By this time, the Holloway family had become familiar with the debtor and his business operations.[7] Mrs. Holloway was intrigued by LeNeve's promised returns on investments, and she testified that she instructed Andre to invest the money with LeNeve rather than repay her directly. She claims to have loaned LeNeve a total of $700,000.00 by way of two cashier's checks which were delivered to LeNeve by Laura Andre.

Greg Holloway, Laura Andre, and LeNeve likewise testified that Mrs. Holloway invested these funds in his business operations. According to LeNeve, Mrs. Holloway's $650,000.00 investment was deposited into the account of GRF, while the $50,000.00 investment was deposited into an account for REAL Partners. Mrs. Holloway's testimony reflects the fact that she didn't particularly understand LeNeve's "business," other than the promise of sizeable returns on her investments with him. She indicated that she had learned things during the trial that she hadn't known before, and she was under the impression that she was investing "with Larry," rather than any particular one of his entities.

7. Apparently, the Holloways met LeNeve at a Bible study.

The trustee has repeatedly stressed the cavalier manner in which LeNeve operated, frequently shifting business assets around the various entities he admits that he both dominated and controlled. The record in this case clearly indicates that LeNeve acted with little, if any, regard for the legal distinctions between his companies. Pursuant to the pretrial order, the parties have stipulated that these entities, including GRF, were "mere conduits" for LeNeve himself, and that he used these entities as his "personal accounts." He obviously moved assets from entity to entity to suit his own purposes and does not seem to have had any qualms about how outsiders might perceive his conduct. Despite the haphazard manner in which LeNeve operated, however, it appears clear from the record that Mrs. Holloway did, in fact, invest approximately $700,000.00 with him.

Under the circumstances, it seems immaterial which entity received the funds, as she believed she was basically investing with LeNeve himself. The trustee has demonstrated that these entities are justifiably regarded as essentially a singular operation largely indistinguishable from their human alter ego. Likewise, the method of repayment seems consistent with LeNeve's modus operandi—namely, to treat his various companies as a personal bank account. The trustee complains that none of the checks or documentation related to the transfers clearly indicates that they were to repay an investment. The trustee is also troubled by the sources, timing, and amounts of the transfers. Unfortunately, these problems seem largely consistent with what the trustee has documented as LeNeve's usual business practices, which are admittedly questionable. If LeNeve's general practice was to move money about between entities, essentially robbing Peter to pay Paul, one can hardly be surprised that there is little consistency in the documentation of his payments to investors.[8]

In his testimony at trial, LeNeve acknowledged that GRF maintained a separate bank account from his other ventures and that he could not recall any commingling of the GRF funds with those associated with his real estate deals. He also noted that "for the most part," he used GRF investments to purchase discounted U.S. government receivables, and that investors were "generally" repaid from GRF. However, he indicates that Mrs. Holloway's investments were "rolled over" into his allegedly more profitable real estate ventures and that when the time came for repayment, circumstances had changed and "the money came from where it was sitting." Record at 112–13. This testimony is actually quite consistent with the suggestion that LeNeve was manipulating investors and massaging payouts to best suit his own purposes whenever possible.

---

8. For example, the trustee notes that Mrs. Holloway did not receive any statements or other periodic accountings from LeNeve, and that she has very little in the way of documentation to substantiate her contention that Laura Andre owed her any money at all, let alone the sizeable sum purportedly repaid by the investment in LeNeve's GRF entity. The trustee suggests that the Court should not accept the factual scenario that Mrs. Holloway would have loaned Ms. Andre sizeable sums of money without documentation, or that she would wait more than three years to receive any money from LeNeve. However, the testimony evidences a relatively remarkable casualness toward legal formalities. One might as well ask, if one assumes that Mrs. Holloway is unlikely to loan money as she claims to family or friends, why she would agree to receive hundreds of thousands of dollars to which she was not entitled. Having witnessed Mrs. Holloway's demeanor in court, such behavior seems highly unlikely, which suggests that she is in fact the sort of person who loans money quite informally, albeit with an expectation of repayment.

■ This discussion leads inescapably to the crux of the case. The trustee has argued that LeNeve either transferred the funds to Mrs. Holloway in an effort to hinder, delay, or defraud legitimate creditors of his estate, or that he failed to receive reasonably equivalent value for what he gave to her. Mrs. Holloway has demonstrated that she invested $700,000.00 in LeNeve's business. Initially her investment was in GRF's factoring operation. Subsequently, LeNeve convinced her to leave her money with him, ostensibly for his real estate investments. Nonetheless, in comparing the amount that "came in" with the amount that "went out," it would appear that the debtor may well have received more than he paid back.[9] The trustee contends that the debtor intentionally transferred these funds to Mrs. Holloway in order to defraud other creditors. The problem with this argument is that Mrs. Holloway is herself a creditor, and repaying one creditor at the expense of others may not be nice but it does not automatically provide conclusive evidence of fraudulent intent.

Were the trustee attempting to avoid this transfer as a preference under 11 U.S.C. § 547, the transfers might well be avoidable. But preference recoveries are concerned with the notion of fair distribution between creditors of the estate and not fraudulent intent. These transfers fall outside the scope of the preference provisions of the code, and consequently the trustee must demonstrate either that the debtor did not receive reasonably equivalent value (thus representing a "constructive fraud" upon creditors) or that the debtor acted with a specific intent to hinder, delay, or defraud creditors while making these transfers. If LeNeve was simply repaying an investor, that conduct alone cannot amount to evidence of fraudulent intent. Instead, it constitutes the payment of an antecedent debt. Unless the trustee can offer additional proof of fraudulent intent, the action for actual fraud must fail.

■ Fraudulent intent is often not proven by direct evidence; instead, courts typically must resort to circumstantial evidence, often described as the "badges of fraud." As the court stated in *Khanani:*

> Common badges of fraud include: (1) the lack or inadequacy of consideration for the property transferred; (2) the existence of a family, friendship or other close relationship between the transferor and the transferee; (3) the transferor's retention of the possession, control, benefits or use of the property in question; (4) the financial condition of the transferor both before and after the transfer took place, i.e., whether the transfer resulted in insolvency; (5) the cumulative effect of these transactions and course of conduct after the onset of financial difficulties or dependency or threat of suit by creditors; and (6) the general chronology and timing of the transfer in question.

2005 WL 2482392, at *8. Even the presence of only one of these factors has been held to justify a finding of actual fraudulent intent. *Id.* The principal difficulty the trustee faces, however, is that the repayment of an antecedent debt in this case is arguably a critical factor. If the transferee provided prior equivalent "value" to the debtor, it is difficult to contend that the debtor's repayment of such an obligation is

---

9. While the trustee is concerned about the issue of the additional $450,000.00 transfer, the trustee has not met his burden of proof on that point, and so the Court can only compare the remaining transfers to the investment amount.

fraudulent simply because the transfer was made to a friend.[10]

To buttress his arguments about fraudulent intent, the trustee stresses the existence of LeNeve's overall fraudulent "scheme," his efforts to impede the trustee's inquiry into his assets, and the like. But the crucial issue is the intention of the transferor at the time of the transfer: Did LeNeve intend to hinder, delay, or defraud creditors when he paid Mrs. Holloway the money in question? In this regard, at least, it appears that he simply sought to repay one of his creditors. The fact that those payments were ultimately at the expense of others proves little more than that LeNeve finally ran out of money to fund his various schemes or to repay those who funded his ventures.

■■ Likewise, to the extent that LeNeve repaid Mrs. Holloway for her investments, he clearly received "reasonably equivalent value" for what he transferred to her. In fact, he appears to have received more than was repaid. From the record, it appears that Mrs. Holloway may well have invested her money in a fraudulent scheme. But the fact that LeNeve was engaged in fraud does not itself eliminate the "value" of the investment. In *Dicello v. Jenkins (In re International Loan Network)*, 160 B.R. 1 (Bankr.D.D.C. 1993), the court noted that investors in a fraudulent operation or Ponzi scheme

nonetheless have a claim for the return of their initial investment.

■■ Whether characterized as a contractual obligation or a right to restitution, from the moment a person entrusts money to a debtor, the debtor is indebted to them for the amount of that investment. *Id.* at 12. It has long been held that an investor in a fraudulent scheme has a right to recover his principal from the moment he was deceived into paying it. See *Eby v. Ashley*, 1 F.2d 971, 973 (4th Cir.1924), cert. denied, 266 U.S. 631, 45 S.Ct. 197, 69 L.Ed. 478 (1925). Consequently, as the court stated in *Dicello:*

> As a result, payments made to each defendant up to the amount of their original investment satisfied an "antecedent debt" of [the debtor], and thus [the debtor] received value in exchange for the transfers. Moreover, this value was certainly "reasonably equivalent"; it was the exact same value—dollar for dollar.

160 B.R. at 12; *see also Merrill v. Abbott (In re Indep. Clearing House Co.)*, 77 B.R. 843 (D.Utah 1987). A trustee can only avoid transfers made to repay an investor to the extent that those transfers exceed the investor's initial investment, or represent commissions for additional effort, such as soliciting other investors to join the scheme. *Dicello*, 160 B.R. at 13–14; *see also Randy*, 189 B.R. at 442.

**10.** It is difficult at times to distinguish between the trustee's actual and constructive fraud arguments, as the trustee's actual fraud arguments are largely premised upon the perception that Mrs. Holloway did not provide "value" of any kind to the debtor. If one removes that aspect of the trustee's claim that the transfers were part of a scheme to hinder, delay, or defraud creditors, however, there is very little left to demonstrate actual fraudulent intent with regard to these specific transfers. Admittedly, LeNeve appears to have been engaged in some sort of fraudulent investment scheme, but to the extent that LeNeve was simply repaying a creditor dollar-for-dollar on an antecedent debt, there must be other evidence of fraudulent intent—evidence which is unfortunately lacking. There is no evidence that LeNeve maintained possession, control, or use of the funds, and his shaky financial condition was not the result of these transfers. While the repayment did not occur on a set schedule, Mrs. Holloway clearly wanted her money back and the debtor attempted to comply.

In response to this, the trustee contends that any investment Mrs. Holloway made was not in fact with the debtor but to a separate entity—namely, GRF. In this regard, a debtor's payment "on behalf of a third party" typically remains avoidable in bankruptcy because the debtor did not receive value in exchange. The courts in such cases as *In re Rodriguez*, 895 F.2d 725 (11th Cir.1990), and *Schafer v. Las Vegas Hilton Corp. (In re Video Depot)*, 127 F.3d 1195 (9th Cir.1997), recognized that payments made by a corporate debtor on behalf of a subsidiary or a principal did not constitute "reasonably equivalent value" as the debtor was not legally obligated to pay the debt; therefore, the transfers were not made on account of a valid antecedent debt.

In *Rodriguez*, for example, the debtor apparently operated a large fraud scheme for which he was convicted. One of his holding companies was also a debtor in bankruptcy, and had made payments to General Electric Capital Corporation on behalf of one of his other entities. The trustee of the holding company sought to avoid the transfers, and the court concluded that it was proper to do so. As the Eleventh Circuit stated:

> The purpose of voiding transfers unsupported by "reasonably equivalent value" is to protect creditors against the depletion of a bankrupt's estate ... Therefore, this provision does not authorize voiding a transfer which "confers an economic benefit upon the debtor," either directly or indirectly .... In such a situation, "the debtor's net worth has been preserved," and the interests of the creditors will not have been injured by the transfer.

895 F.2d at 727. The trustee suggests that the holding in *Rodriguez* mandates that Mrs. Holloway's investment cannot legitimately be repaid by one of LeNeve's other entities. However, much of the discussion in *Rodriguez* and similar cases presuppose an essential element: namely, a division between the entity which receives the "value" from the creditor and the one which subsequently "transfers" the corresponding payment.

Likewise, in *Schafer*, the court concluded that a corporate debtor's payment of the principal's gambling debt was not for reasonably equivalent value as it could not be found that the corporate debtor received any "value" in connection with the principal's games of chance. But this rule is of course nothing new; as the court held in *In re Butcher*, 58 B.R. 128 (Bankr. E.D.Tenn.1986), an individual debtor's payment of a non-debtor corporation's debt is not "reasonably equivalent value." It is a fundamental principle of fraudulent transfer cases that one cannot normally pay another's debts and contend to have received "reasonably equivalent value" in exchange.

This bankruptcy case presents a rather unique situation, however, and brings to mind the Eleventh Circuit's admonishment in *Rodriguez* that the fraudulent transfer statutes do not authorize voiding a transfer which "confers an economic benefit upon the debtor," either directly or indirectly. 895 F.2d at 727. LeNeve is the principal of a variety of corporate and partnership entities, and it is unclear which of those entities, if any, are themselves in bankruptcy. Nonetheless, the trustee has contended, and proven, that LeNeve operated these businesses as mere instrumentalities and alter egos of himself; he completely disregarded the legal status of these entities time and again.

Consequently, the trustee believes that the assets of these entities are essentially LeNeve's assets. It must likewise be assumed that the creditors of these entities

are in fact LeNeve's creditors.[11] The trustee's argument, after all, is that the transfers in question dissipated the assets of the debtor's estate. None of the transfers, however, actually came from LeNeve himself; they were all made from his various entities. From the trustee's perspective, the assets of these entities are in fact LeNeve's own assets because he controlled the flow of the money through all of them. Otherwise, the assets of the entities which actually made the transfers to Mrs. Holloway would not belong to him at all, nor would they constitute property of this bankruptcy estate. *Barfield v. Sana of Jacksonville, Inc. (In re Barfield)*, 261 B.R. 793 (Bankr.M.D.Fla.2001); *Miner v. Bay Bank & Trust Co. (In re Miner)*, 185 B.R. 362 (N.D.Fla.1995).

It thus seems quite odd to acknowledge on the one hand the informality of LeNeve's business dealings while compressing corporate or partnership assets into his bankruptcy estate but insist upon the proprieties of corporate form when considering whether the debtor received "value" from Mrs. Holloway. After all, the trustee seemingly concedes that any funds received by GRF were under the exclusive control of LeNeve.[12] From the testimony at trial, it appears that it was LeNeve, not Mrs. Holloway or Laura Andre, who made the decision to deposit the $50,000.00 cashier's check into the account of REAL Partners. Mrs. Holloway believed she was doing business with LeNeve himself, and LeNeve clearly appears to have had control over the ultimate distribution of the "invested" amount. He also appears to

have secured her agreement to "roll over" her investment rather than repay it.

Under the circumstances, the "value" given by Mrs. Holloway simply cannot be limited to an investment in a separate, free-standing corporation. To treat her investment in such a manner would ignore the reality of the debtor's manipulation of his various companies as his personal financial playthings. Instead, it is necessary to recognize the fact that Mrs. Holloway's "investment" of $700,000.00 was to the direct benefit of the debtor himself, not a third party. The debtor treated her funds as his own; the Court cannot pretend otherwise. As a result, payments made to her can only be avoided to the extent they exceed the amount of her initial investment. As the $507,215.00 in transfers is less than her $700,000.00 investment, they cannot be avoided. As the court noted in *Steinberg*, "what went out" was in this case less than "what was received." 121 B.R. at 994.

Accordingly, the Court concludes that the fraudulent transfer counts of the complaint (Counts XIV, XV, XVI, XVII, and XVIII) against Mrs. Holloway should be dismissed. The parties shall bear their own costs.

This decision shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and Rule 52 of the Federal Rules of Civil Procedure.

---

11. In any event, Mrs. Holloway seems to have believed that she was doing business with LeNeve himself.

12. Indeed, based upon the trustee's arguments, it must be assumed that had LeNeve filed bankruptcy while some portion of Mrs. Holloway's $650,000.00 was still in an account in GRF's name, the trustee would con-

tend that those funds were not simply assets of a non-debtor, but were in fact the assets of LeNeve himself, to be distributed to his creditors and not simply to the creditors of GRF. After all, LeNeve has conceded that he exercised complete dominion and control over the money in GRF's accounts.